NOVEMBER TERM, 1869.    27

Board of Commissioners of Montgomery Co. and Another *v.* Elston.

## BOARD OF COMMISSIONERS OF MONTGOMERY CO. and Another *v.* ELSTON.

TAX.—*U. S. Treasury Notes.*—The United States treasury notes popularly known as "greenbacks" are not liable to state taxation.

SAME.—*Power of Government to Exempt.*—The foundation of the power of the government to exempt her treasury notes from taxation is, that their sole value depends upon the promise of the government to ultimately redeem them in gold.

SAME.—*National Bank Currency.*—The notes of national banks, known as "national currency," are not exempted from state taxation.

*Query* whether Congress has power to make such exemption.

SAME.—*Injunction.*—Injunction will not lie to prevent the collection of a tax in part legal and in part illegal.

APPEAL from the Montgomery Common Pleas.

RAY, J.—This was a complaint by the appellee against the board of commissioners and treasurer of Montgomery county, to restrain a sale of certain personal property, levied upon by the said treasurer by virtue of a warrant to collect the sum of four hundred and eighteen dollars and forty-nine cents, being the amount of tax and penalty on twenty-seven thousand one hundred and seventy-five dollars in the hands of the appellee on the first day of January, 1868.

One-half of this sum was in treasury notes of the United States, known as "greenbacks;" the remaining portion was in the notes of the national banks, designated as "national currency." This sum had been returned for taxation under protest.

A demurrer was overruled to this complaint, and a perpetual injunction was granted.

That the moiety of this sum upon which the tax was assessed which consisted of treasury notes was not liable to taxation, has been already decided by the Supreme Court of the United States, in the case of *Bank* v. *Supervisors,* 7 Wal. 26.

While it is ruled, that these notes were issued under the

authority of the United States and as a means to ends entirely within the constitutional power of the government, and that Congress has in express terms declared, that they shall not be subject to state taxation, the Chief Justice, who pronounced the opinion in that case, proceeds,

"But it was insisted that they were issued as money; that their controlling quality was that of money, and that therefore they were subject to taxation in the same manner, and to the same extent, as coin issued under like authority.

"And there is certainly much force in the argument. It is clear that these notes were intended to circulate as money, and, with the national bank notes, to constitute the credit currency of the country.

"Nor is it easy to see that taxation of these notes, used as money, and held by individual owners, can control or embarrass the power of the government in issuing them for circulation, more than like taxation embarrasses its power in coining and issuing gold and silver money for circulation.

"Apart from the quality of legal tender impressed upon them by acts of Congress, of which we now say nothing, their circulation as currency depends on the extent to which they are received in payment, on the quantity in circulation, and on the credit given to the promises they bear. In these respects they resemble the bank notes formerly issued as currency.

"But, on the other hand, it is equally clear that these notes are obligations of the United States. Their name imports obligation. Every one of them expresses upon its face an engagement of the nation to pay to the bearer a certain sum. The dollar note is an engagement to pay a dollar, and the dollar intended is the coined dollar of the United States; a certain quantity in weight and fineness of gold or silver, authenticated as such by the stamp of the government. No other dollars had before been recognized by the legislation of the national government as lawful money.

"Would, then, their usefulness and value as means to the

exercise of the functions of government, be injuriously affected by state taxation?

"It cannot be said, as we have already intimated, that the same inconveniences as would arise from the taxation of bonds and other interest bearing obligations of the government, would attend the taxation of notes issued for circulation as money. But we cannot say that no embarrassment would arise from such taxation. And we think it clearly within the discretion of Congress to determine whether, in view of all the circumstances attending the issue of the notes, their usefulness, as a means of carrying on the government, would be enhanced by exemption from taxation; and within the constitutional power of Congress, having resolved the question of usefulness affirmatively, to provide by law for such exemption."

The evident foundation upon which the power of the government to exempt her treasury notes from taxation reposes is, that the sole value of such notes depends upon the promise of the government to ultimately redeem them in gold. They circulate as currency, not, like gold and silver, by reason of their intrinsic value, but by virtue of the promise impressed upon them and the faith given to that promise; in other words, upon the credit of the government. And therefore a tax upon the notes is simply a tax upon that which gives them value, the promise of the government—a tax upon her credit.

It is not a reason why treasury notes should be taxed, that they circulate as bank notes recently issued by private corporations. Such circulation depended upon the credit of the private corporation, and that was a proper and legitimate subject for taxation. These notes circulate by reason of the trust reposed in the credit of the government, and that credit is not a subject within the sovereignty of the state to tax.

It was upon this ground, that it was held, in *Weston* v. *The City of Charleston*, 2 Pet. 449, that a tax imposed by a law of any state on stock issued for loans to the United States is unconstitutional.

This distinctly appears from the opinion pronounced by Chief Justice MARSHALL. We make this extract: "No one [power] can be selected which is of more vital interest to the community than this of borrowing money on the credit of theUnited States. No power has been conferred by the American people on their government, the free and unburdened exercise of which more deeply affects every member of our republic. In war, when the honor, the safety, the independence of the nation are to be defended, when all its resources are to be strained to the utmost, credit must be brought in aid of taxation, and the abundant revenue of peace and prosperity must be anticipated to supply the exigencies, the urgent demands of the moment. The people, for objects the most important which can occur in the progress of nations, have empowered their government to make these anticipations, 'to borrow money on the credit of the United States.' Can anything be more dangerous, or more injurious, than the admission of a principle which authorizes every state and every corporation in the union which possesses the right of taxation, to burden the exercise of this power at their discretion?

"If the right to impose the tax exists, it is a right which in its nature acknowledges no limits. It may be carried to any extent within the jurisdiction of the state or corporation which imposes it, which the will of each state and corporation may prescribe. A power which is given by the whole American people for their common good, which is to be exercised at the most critical periods for the most important purposes, on the free exercise of which the interests certainly, perhaps the liberty, of the whole may depend, may be burdened, impeded, if not arrested, by any of the organized parts of the confederacy. * * * We have considered it as a necessary consequence from the supremacy of the government of the whole that its action in the exercise of its legitimate powers should be free and unembarrassed by any conflicting powers, in the possession of its parts; that the powers of a state cannot rightfully be so

exercised as to impede and obstruct the free course of those measures which the government of the states united may rightfully adopt. * * * The tax on government stock is thought by this court to be a tax on the contract, a tax on the power to borrow money on the credit of the United States, and consequently to be repugnant to the constitution."

And what was this issue of these treasury notes, to circulate as money among the people, but a borrowing of money without interest from the people?

These treasury notes had their origin in the very exigency contemplated by this learned jurist. They were issued at a moment when the government, stripped of her property and menaced in her capital, was compelled to demand of her citizens the peril of property and life alike on the faith of her promise.

It is pleasant that we may look away from these scenes of conflict and strife—from the plea of public necessity—back to those times of peace and quiet, when, in the calm discussion of legal propositions, principles were evolved, which now protect that public faith, pledged in such desperate strait.

There remain but two questions. Has Congress attempted to extend this exemption from state taxation to the currency issued by the national banks? If she has declared this exemption, was the subject within her jurisdiction?

The act of February, 1862, declares, that "all stocks, bonds, and other securities of the United States held by individuals, corporations, or associations, within the United States, shall be exempt from taxation by or under state authority." 12 Stat. at Large, 346, § 2.

And this provision is re-enacted, in application to the second issue of United States notes, by the act of July 11th, 1863. 12 Stat. at Large, 546.

And, as if to remove every possible doubt from the intention of Congress, so far as treasury notes were involved

(the national bank notes not then being issued), the act of March 3d, 1863, 12 Stat. at Large, 709, which provides for a further issue of treasury notes, omits in its exemption clause the word "stocks," and substitutes for "other securities" the words "treasury notes or United States notes issued under the provisions of this act." The act authorizing the issue of national bank notes was approved June 3d, 1864, and the 22d section provides that the notes shall express upon their face the promise of the association receiving the same to pay on demand, and that they are secured by the deposit of United States bonds with the treasurer of the United States. But these bonds are not the property of the United States, but of the national bank issuing the notes. It is true that the government in the act agrees to redeem the notes on failure of the bank, but the primary liability rests upon, and promise to pay comes from, the national bank, and before the government does so redeem, she declares forfeit to herself all bonds deposited as security for the issue, these bonds being in excess of the aggregate of notes, and the bonds her own promise. Thus, in fact, in payment of the notes, by her, she simply pays her own bonds at less than their face, and may cancel an amount of said bonds at their current rate, not to exceed par, equal to the currency redeemed, and shall hold a first and permanent lien for any deficiency in the proceeds of the bonds, if sold, on the assets of the bank. There is no clause in this act exempting the notes from state taxation, but an express provision making its shares liable.

It is insisted, however, that the act approved June 30th, 1864, entitled an "act to provide ways and means for the support of the government, and for other purposes," 13 Stat. at Large, 218, exempts this issue of the "national currency," as it is entitled. The first section of that act declares that "all bonds, treasury notes and other obligations of the United States shall be exempt from taxation by or under state or municipal authority."

The last section is as follows:

"Sec. 13. *And be it further enacted*, that the words 'obligation or other security of the United States,' used in this act, shall be held to include and mean all bonds, coupons, national currency, United States notes, treasury notes, fractional notes, checks for money of authorized officers of the United States, certificates of indebtedness, certificates of deposit, stamps, and other representatives of value of whatever denomination, which have been or may be issued under any act of Congress."

This, at a first glance, might seem to bring "national currency" within the exemption, and, as we are not indebted to counsel for a solution of the difficulty, doubtless has misled them in the argument. But the words in quotation in the thirteenth section are technical, and are not the identical words used in the same order in the first section, and therefore the reference to that section would be more than questionable. All doubt, however, is removed, by the use of the same technical phrase, in the eleventh section of the same act, in which it is provided, "that if any person having control, custody, or possession of any plate or plates from which any *obligation or other security* or any part thereof shall have been printed," &c., "or shall have or retain in his custody or possession, after a distinctive paper shall have been adopted by the Secretary of the Treasury for *obligations and other securities of the United States*, any similar paper adapted to the making of any such obligations or other security," &c., "every person so offending shall be deemed guilty of a felony and shall, on conviction thereof, be punished," &c.

It thus appears plain that the entire intent and purpose of the last section of the act was to throw around "national currency" the same guards against counterfeiting that were by law provided for "obligations and other securieties of the United States."

Clearly, no exemption in any act prior to the authority given to issue "national currency" can apply, and as they are not obligations of the United States, in any proper sense of

that expression, as they do not rest primarily on the promise of the government to pay them as her own debt, but simply on her promise that she will amply indemnify herself in her own bonds, and only after failure of the bank and forfeiture of the bonds to her will she regard herself as finally liable; certainly, there is nothing in the letter of the law exempting this circulation from taxation; and though we do not discuss the power of Congress to make such exemption, we are free to admit that we see nothing in the paper itself or the circumstances of its issue which would authorize such a limit to be placed on the power of the state to tax.

It follows, that the amount of the assessment on the moiety consisting of treasury notes was unauthorized and illegal; and that the amount rated upon that portion consisting of currency of the national banks was legal and proper.

Under a rule often expressed in this court, the appellee, not having tendered to the treasurer of the county the amount legally due, cannot successfully invoke the aid of the court by the interposition of its extraordinary remedy of injunction to prevent the collection of a tax in part legal and in part illegally assessed.

Judgment reversed, and cause remanded, with direction to sustain a demurrer to the complaint for injunction. Costs here.

*P. S. Kennedy* and *R. H. Galloway,* for appellants.
*S. C. & L. B. Willson* and *J. M. Butler,* for appellee.