(No. 39772.—

LAWRENCE P. HICKEY *et al.*, Appellants, *vs.* ILLINOIS CENTRAL RAILROAD COMPANY, Appellee.

*Opinion filed Sept. 23, 1966.—Rehearing denied Oct. 27, 1966.*

WILLIAM G. CLARK, Attorney General, of Springfield, (EDMUND A. STEPHAN, SHERWOOD K. PLATT, ROBERT L. STERN, and ARNOLD H. LOZOWICK, Special Assistant Attorneys General, of counsel,) for appellant State of Illinois.

RAYMOND F. SIMON, Corporation Counsel, LEONARD R. HARTENFELD, O'KEEFE, O'BRIEN, HANSON AND ASHENDEN, JOHN O. TOUHY, and BURTON H. YOUNG, all of Chicago, for other appellants.

ROBERT MITTEN, A. EDMUND PETERSON, JOHN MANN, WILLIAM M. RICE, and KIRKLAND, ELLIS, HODSON, CHAFFETZ & MASTERS, all of Chicago, (THOMAS M. THOMAS, WILLIAM R. THEISS, and GORDON H. S. SCOTT, of counsel,) for appellee.

Mr. JUSTICE UNDERWOOD delivered the opinion of the court:

Shortly after dismissal of their similar suit in the Federal courts (*Hickey* v. *Illinois Central Railroad,* (7th cir., 1960,) 278 F.2d 529, *cert.* den. 364 U.S. 918) several taxpayers filed an action in the circuit court of Cook County against the Illinois Central Railroad Company alleging that

title to a quite substantial amount of largely reclaimed land on Chicago's lake front between the Chicago River on the north and 51st Street on the south was vested in the State of Illinois or, as to portions thereof, in the city of Chicago. That complaint as ultimately amended requested a finding and declaration that the interest of the defendant railroad in the lands in question is limited to an easement for use and control for railroad purposes; that ownership and title are vested in the State of Illinois in trust for the inhabitants of this State and, to the extent granted or delegated by the State or otherwise obtained by the city, in the city of Chicago; that in the event of use or disposition of the lands by the railroad for other than railroad purposes, its easement terminates; that certain sales, leases, contracts and options granted by the railroad to portions of the questioned land and the air rights above said land for other than railroad purposes are null and void and that the railroad should be required to account to the State and city for the proceeds from such sales and be perpetually enjoined from making further sales, leases or other dispositions of the questioned property for nonrailroad purposes.

In 1962 the city of Chicago was allowed to intervene as an additional party plaintiff, and adopted the above-summarized complaint of the original plaintiffs as its own. Thereafter the defendant moved to dismiss the action, and the trial court so ordered, finding the State to be a necessary party to determination of the controversy, that the taxpayers had no standing to represent the State, and that the court could not constitutionally compel the State to intervene as plaintiff or defendant.

In the subsequent appeal to this court by the taxpayers and the city, the Attorney General filed a motion to dismiss, suggesting that plaintiff taxpayers had no standing to maintain the action. Following denial of that motion and while the case was pending upon our advisement docket, the Attorney General moved for leave to intervene. Since

intervention by the State supplied the indispensable party whose prior absence constituted what then appeared to be the principal obstacle to maintenance of the suit, we remanded the cause for further proceedings. *Hickey* v. *Illinois Central Railroad Co.* 30 Ill.2d 163.

Thereafter the Attorney General filed in the trial court an intervening complaint substantially aligning the State of Illinois with the position of the taxpayer-plaintiffs and the city of Chicago. This complaint concludes with a prayer for a declaration of the State's title to all lands east of the 1852 Lake Michigan shoreline (roughly Michigan Avenue) between the Chicago River and Randolph Street and between 11th Place (Park Row) and Hyde Park Boulevard (51st Street) subject to the easement of the Illinois Central to such portions of these lands as are necessary to its railroad operations, requiring the railroad to account for the proceeds of its "wrongful" dispositions of such lands and air rights, that upon receipt by the State of such proceeds the rights of the grantees and lessees thereunder be confirmed, and permanently enjoining the Illinois Central from future sales, leases or other dispositions of the lands or air rights.

The railroad answered the intervening complaint, and, following a reply by the State, filed a motion for judgment on the pleadings. Its original motion to dismiss the taxpayers' and city's second amended and supplemental complaint on its merits was then undisposed of. Since it raised substantially the same points as the motion for judgment on the pleadings against the State, it was allowed to stand, and judgment was thereafter entered dismissing the taxpayers', city's and State's complaints for want of equity and declaring the defendant railroad to be the fee-simple owner of all of the lands in question between the Chicago River and Randolph Street and south of 11th Place.

The reclaimed lands involved herein are of immense value, and particularly is this so in view of the present practice of constructing large high-rise buildings over por-

tions thereof where possible to do so without disturbing their use for railroad purposes. Rights to future development of the overlying air rights for nonrailroad purposes are determined by the fee ownership of the lands. If the State has retained the fee-simple title to the land, and the railroad has only a right-of-way for railroad purposes, the State owns and may sell the "air rights" over the property (which would otherwise be subject to control and sale by the railroad) for any purpose compatible with continued railroad usage.

This appeal by the State, city and taxpayers from that judgment presents substantial problems in a remarkably complicated context. Their resolution has necessitated a review of the history of the Chicago lake front and the Illinois Central Railroad since 1851. In that year defendant was incorporated by an act of the General Assembly which granted it a right-of-way 200 feet wide throughout the length of the State and required the consent of any city prior to location of the railroad tracks within such city's corporate limits. In 1852 the city of Chicago adopted an ordinance consenting to construction of the railroad along the lake front from the city's southern boundary (then 22nd Street) to the Chicago River, providing for the erection of "necessary and convenient buildings, slips or apparatus", giving the railroad the right to "extend their works and fill out into the lake" in specified areas and for specified distances. In return, the railroad was required to and did erect and maintain a breakwater east of its tracks from Randolph Street to the then southern boundary of the city. (This was later extended south to 49th Street.)

Thereafter the railroad acquired by purchase or condemnation the title to the private shorelands on the 1852 shoreline between the river and Randolph Street and south of 16th Street. As to the original shorelands between the Chicago River and Randolph Street, and between 11th Place and 16th Street, the State concedes that the railroad ac-

quired the fee. Concerning the original shorelands south of 16th Street, the State admits that the railroad has, through the exercise of eminent domain and by virtue of various conveyances, purportedly acquired title, but does not admit that fee-simple title was actually acquired thereby. The Illinois Central's tracks, as originally constructed, were partially on land along the shore, and, particularly south of 12th Street, were supported by piling driven into the submerged lake bed. In 1864 the Illinois Central conveyed to the Michigan Central Railroad its interest in some of the filled lands east of Michigan Avenue between the river and Randolph Street, retaining some operating rights and leasehold interest therein. This property was subsequently repurchased at a substantial cost. In 1869 the General Assembly enacted a statute conveying to the Illinois Central all of the State's title to the submerged lands lying east of the tracks and breakwater of the railroad to a point one mile out in the lake between the river and approximately 1500 South. This statute also confirmed the rights of the railroad in certain land lying east of a line running parallel to and 400 feet east of the west line of Michigan Avenue between Monroe Street and 11th Place. This act was repealed in 1873, the repealing statute being held effective as to the conveyance, but not as to the confirmation, by the United States Supreme Court in the Lake Front Case hereinafter mentioned. Between 1870 and 1885 there was further filling of submerged land and building of piers by the Illinois Central.

In 1883, the Lake Front Case was initiated by the State of Illinois when it filed suit against the Illinois Central and the city to ascertain the rights of the respective parties in the lake front lands, both submerged and filled, and the then existing structures between the river and 16th Street. That litigation, originally brought in the circuit court of Cook County, was removed to the then United States Circuit Court for the Northern District of Illinois (*People of the*

*State of Illinois* v. *Illinois Central Railroad Co.* (1888) 33 Fed. 730). Thereafter the cause was before the United States Supreme Court (1892) (146 U.S. 387, 36 L. Ed. 1018), again in the United States Circuit Court, the Circuit Court of Appeals (91 Fed. 955) and ultimately again before the Supreme Court of the United States (*People ex rel. Hunt* v. *Illinois Central Railroad Co.* (1902) 184 U.S. 77, 46 L. Ed. 440). The parties hereto are agreed that those decisions are *res judicata* as to the finding that the city owned the filled lands between Randolph Street and 11th Place, subject only to a right-of-way in the railroad, and as to the previously noted effect of the 1869 and 1873 statutes. They totally disagree concerning the disposition of title to the other lands, the Illinois Central arguing that the net effect of the Lake Front Case was to give it a fee-simple title to the property involved, and the State now vigorously contending that the true purport of the decisions was to construe the interest of the railroad as an easement for such uses as were reasonably necessary to its corporate purposes, including the right to build and maintain piers and wharves out to the point of practical navigability, leaving the fee in the State or city subject to such easement.

By 1912 the lake shore line between 11th Place and 49th Street was composed largely of filled land occupied by the Illinois Central which also claimed fee-simple title thereto. The Park Extension Act of 1907, "An Act authorizing park commissioners to acquire and improve submerged and shorelands for park purposes, providing for the payment therefor, and granting unto such commissioners certain rights and powers and to riparian owners certain rights and titles", (Laws of 1907, p. 433,) authorized park commissioners to construct parks over submerged State lands, and to acquire the "riparian or other rights of the owners" of shorelands adjacent to the public waters over which the improvement was to be built. The act provided the commissioners could obtain such rights from shore owners

by an agreement establishing a boundary line in the lake between the proposed improvement and the lands of the shore owners, and that upon completion of such agreement the commissioners were required to file in the circuit court a petition for confirmation of such boundary line agreement. The owners of the "riparian rights and lands" were required to be made defendants, and the statute further provided if "upon a hearing, the court shall find that the rights and interests of the public have been duly conserved in and by such agreement, then the court shall confirm said agreement and establish such boundary line." Thereafter, to compensate the owners for the loss of their riparian or other rights, the act provided: "[T]he owners of said shorelands are hereby granted by the State of Illinois the title to the submerged lands lying between said boundary line when so established and the shore adjacent thereto, and they shall have the right to fill in, improve, protect, use for all lawful purposes, sell and convey said submerged lands up to the line so established, free from any adverse claim in any way arising out of any question as to where the shore line was at any time in the past, or as to the title to any existing accretions."

The South Park Commissioners desired to use submerged lands in the lake south of 11th Place for a park and boulevard connecting what is now Grant Park with Jackson Park. Since the Illinois Central then claimed ownership of the filled lands between the 1852 and 1912 shorelines and the riparian rights involved from 11th Place to 49th Street, the commissioners in 1912 entered into a comprehensive boundary line agreement with the railroad under which the railroad received, for "the release of its said riparian rights and its interest in the part of said lands penetrating into the said public waters beyond the said boundary line", the areas between the 1912 shoreline and the off-shore boundary line so established, to "have and hold the fee simple title" thereto "and to sell and convey the same". The agreement further

provided that the commissioners might thereafter construct bridges, viaducts, boulevards, and railroad-track coverings over the Illinois Central tracks and lands at certain places and under specified conditions, that the railroad would move its 12th Street Station, dedicate certain land for park and boulevard purposes, and, in general, implemented the area's developmental scheme. Thereafter the commissioners petitioned the circuit court for confirmation of the agreement making the Illinois Central, among many others, parties defendant. The petition so filed asserted the railroad to be "the owner of the lands and riparian rights * * * upon the shore of said Lake Michigan on the inner or.shore side of the boundary line". The railroad's answer admitted the allegations of the petition, and the court's final decree, after finding ownership of the shorelands and riparian rights to be vested in the railroad, declared fee-simple title to the therein described lands, submerged and otherwise, west of the boundary line to be vested in the Illinois Central. The State was not, as such, a party to these proceedings, although the transcript thereof contains the following statement by the judge: "Well, furthermore, the duly authorized representatives of the State, although they did not enter formal appearance in this case, did officially come into the courtroom and said to the court that in their opinion there was no interest of the State to be conserved in this case." Several taxpayers who had intervened in the proceedings and who denied the railroad's title to some of the shorelands without alleging State ownership thereof, prosecuted a writ of error to this court. It was dismissed on the ground that the statute contained no provision authorizing review. No. 8807, April 15, 1913.

It appeared in the 1912 proceedings that the railroad had not then acquired any title to some of the shorelands between 23rd and 25th Streets. Accordingly, it was necessary for supplementary proceedings to be held when conveyances to the railroad were subsequently made. This occurred in

1913, notice thereof having been given the Attorney General pursuant to the 1912 statutory amendment hereinafter commented on, and a complete boundary line agreement under the 1912 revision of the 1907 Park Extension Act (Laws of 1912, p. 51) between the Park Commissioners and the railroad was ultimately confirmed by the circuit court.

In 1930 similar boundary line proceedings were had with reference to the land between Randolph Street and the Chicago River, the principal purpose of which was to facilitate connection of the parks under the South Park Commissioners south of the river with those of the Lincoln Park Commissioners north of the river. Prior thereto and in the 1920's the railroad had filled in the slips between the piers north of Randolph Street, action which appears to be contrary to the 1888 decree in the Lake Front Case enjoining the railroad against further filling of submerged lake front land, but done with the consent of the Federal government, the Department of Public Works and Buildings of the State of Illinois and the city of Chicago. During 1929, and preliminary to the boundary line proceedings, the city adopted an ordinance implementing the park-connecting purpose heretofore mentioned and providing for construction of an "Outer Drive Bridge", new boulevards connecting it to the Grant Park boulevards, and for a network of elevated streets over the area encompassed by Lake Shore Drive, Randolph Street, Beaubien Court and the Chicago River. The provisions of this ordinance were accepted and agreed upon by the Illinois Central and the South Park Commissioners, the agreement including establishment of a boundary line in the lake, and providing that fee-simple title to submerged lands 280 feet in width east of the existing shore lands and directly south of the proposed bridge be vested in the railroad. The southern end of the bridge and the viaducts connecting it to Lake Shore Drive in Grant Park were all to be built over filled lands occupied by the Illinois Central or over submerged lands conveyed to the railroad

by the agreement, and not on the submerged lands acquired by the South Park Commissioners east of the boundary line. No development plan for the submerged lands granted to the commissioners was made at that time, and these lands are still under water.

Pursuant to the Park Extension Act as revised in 1912 the South Park Commissioners filed their circuit court complaint seeking confirmation of the boundary line agreement, naming the Illinois Central and others defendants and alleging ownership by the railroad of the filled shore lands adjacent to the lake and east of the Michigan Central lands previously sold by the Illinois Central to the Michigan Central and repurchased in 1951 by the Illinois Central. The 1912 revision of the Park Extension Act required "notice of pendency" of such proceeding to be "given to the Attorney General" and provided: "It shall be the duty of the Attorney General to appear in such proceeding and assert the claim of the State of Illinois, if any, as to any lands involved in such proceeding, which have been improperly taken, made or occupied, and the court shall proceed to hear and determine such claim in said proceeding". (Laws of 1912, sec. 2, pp. 54-55.) The plaintiffs challenge the constitutionality of this statutory requirement on the ground that it waives the State's immunity to suit provided by section 26 of article IV of the Illinois constitution in its command that: "The State of Illinois shall never be made defendant in any court of law or equity," and it is this question which afforded a basis for direct appeal here although jurisdiction might well have been accepted by us because of the important questions presented.

The railroad answered admitting the allegations of the complaint, and the Attorney General, having received the required notice, filed a statement disclaiming any interest on behalf of the People of the State of Illinois in the involved lands. The Illinois Central also included as part of its answer a cross bill realleging its ownership and request-

ing a declaration (not asked in the commissioners' complaint) that it had title to such lands. The Attorney General's disclaimer on behalf of the State stood as an answer to the cross bill, and the court, without objection, entered a decree confirming the boundary line and decreeing fee-simple title to the property east of the Michigan Central lands and west of the boundary line to be vested in the Illinois Central. This decision is urged by the railroad to be conclusive and *res judicata* as to its fee-simple interest in the lands embraced therein, and it is also argued that the decree conclusively precludes the State from claiming any interest in all reclaimed lands west of the boundary line.

The Outer Drive Bridge was subsequently built, (as was a viaduct connecting it with Lake Shore Drive at Randolph Street) over the filled and submerged lands involved in the 1930 boundary line case, and the railroad filled the rest of the submerged lands west of the boundary line. Since then the Michigan Central lands have been repurchased by the Illinois Central, at a cost of $4,500,000, and the latter has consummated sales of air rights and caisson and supporting column sites for nonrailroad uses on and over portions of the disputed lands at a gross sales figure approximating $5,500,000. In addition it is not disputed that there are outstanding unconsummated contracts, leases and options presumably aggregating many more millions of dollars.

The plaintiffs maintain that the Lake Front decisions left title to the filled lands in the State subject to the railroad's easement; that the 1912, 1913 and 1930 boundary line agreements and decrees were ineffective to transfer to the railroad title to the lands involved therein because in addition to the constitutional contention mentioned earlier, (1) such agreements could be made only with shore land owners, and the State, not the railroad, was the owner of the shore lands and riparian rights embraced in those proceedings; (2) the decrees therein cannot be *res judicata* as

against the State since it was not a party to the proceedings which, in any event, were not adversary in nature; and (3) the 1930 proceedings were void because the contemplated park improvement was to be situated inside rather than outside the boundary line. It is further urged that this action is not barred by the Illinois Marketable Title Act (Laws of 1959, pp. 991, 993) since the taxpayer's suit was brought within the statutory grace period and the State's subsequent intervention after termination of the grace period was proper, and that the doctrines of *laches* and estoppel are not applicable against the State nor are they apposite here in any event since disputed factual matters are involved.

The railroad predicates its claim and argument upon its interpretation of the Lake Front Case opinions as giving it a fee title to the lands there involved, the conclusiveness of the boundary line agreements and decrees, the Marketable Title Act limitations provisions, and its argument that it would be grossly inequitable to permit the State and city to repudiate a position which they have consistently maintained for more than 50 years. In support of the last of these the railroad alleges, without denial by the State or city, a remarkably lengthy series of official acts, statements and declarations by various officials, bodies or representatives of the State, indicating that the now disputed title to these lands was then vested in the Illinois Central. Without attempting to detail the State's position as to each, it may be said fairly that the State concedes the specific acts and statements were performed or made, but disputes the conclusions to be drawn therefrom. This, however, does not present a controverted fact, resolution of which requires the taking of evidence, but involves only the legal consequence of an admittedly performed act or concededly made statement. Since the factual bases of these allegations were before the trial court, and are admitted, they may be urged in support

of the judgment on appeal even though not directly ruled on by the trial court. *In re Estate of Leichtenberg,* 7 Ill.2d 545, 549.

Among the relevant material not previously set forth appear the following noteworthy circumstances: The 1852 ordinance of the city of Chicago establishing the right of the Illinois Central to enter the city expressly provided that the railroad should have the right to fill the lake bed within specified limits not precisely ascertainable from the material before us; prior to 1883, the year in which the Lake Front Case was filed, the Illinois Central had filled a good deal of submerged land, both north of Randolph Street and south of 11th Place, and had built numerous piers and wharves along the south bank of the Chicago River extending from the lake shoreline out into the lake within the questioned areas. Also, a station and other buildings appurtenant to railroad operations were erected, many on reclaimed lands. In his brief in the United States Supreme Court on appeal from the circuit court of appeals decree (91 Fed. 955) the Attorney General for the State of Illinois stated that the appeal was from "the decree of the United States Circuit Court of Appeals for the Seventh Circuit, confirming the decree of the United States Circuit Court for the Northern District of Illinois, awarding to the appellee, Illinois Central Railroad Company, a portion of the bed of Lake Michigan, * * *.

"The property in controversy is all the land lying east of [the 1869 breakwater] * * *. According to the decision of this court, when this case was here before * * * this occupation *west* of said breakwater was confirmed by the Act of the Illinois legislature of April, 1869, and the railroad thereby became the owner of the shore bounded on its seaward side by this breakwater.

"The land now involved comprises some 53 acres, of which 44 acres are land raised above the waters of Lake Michigan by the appellee railroad company filling in the bed

of the lake; while 9 acres are submerged and lie within the slips * * * what was the State's is by the lower court declared to belong to the railroad." The decree appealed from was affirmed.

It is apparent that thereafter there was some lack of unanimity as to who had title to the lake front property, for the 46th General Assembly (1909) adopted a joint resolution creating the Submerged and Shoreland Legislative Investigating Committee "to make a careful and complete investigation of the rights of the State of Illinois, in land lying along, in and upon Lake Michigan * * *." Its subsequent report recommended that the Attorney General take appropriate action to prosecute the claims of the State to the lake front property claimed by the Illinois Central. Apparently as a result thereof the Attorney General in 1910 filed in the Cook County superior court suit seeking a judgment declaring the State to be the owner of all of the reclaimed land east of the easterly boundary of the railroad's 200-foot right of way, and enjoining further filling of submerged lands by the railroad. The 1912 report of Attorney General Stead (*Biennial Report of the Attorney General of the State of Illinois*, 1912, at xxv) stated the State's position as to this litigation as follows: "Although much work has been done in connection with the investigation of this case, it has been deemed best to defer further action therein until after the adjournment of the coming session of the General Assembly, in order that, if it is deemed expedient, further legislation may be had relative to the agreement referred to [the 1912 agreement]. Furthermore, the amount of made land outside of the 200-foot strip is not large and the expense of the litigation, if proceeded with, would be heavy, and, in my judgment, ought not to be incurred, if the agreement already entered into by the Park Commissioners and the railroad company meets with the approval of the General Assembly." No further legislation was adopted nor any other General Assembly action taken, and

in 1913 this suit was dismissed by the State following entry of the decrees in the 1912 and 1913 boundary line proceedings declaring fee-simple title to the lands shoreward of the boundary line to be vested in the railroad.

In 1916 a complaint was made to the secretary of the Rivers and Lakes Commission of Illinois, apparently by a private citizen, the substance of which was that the Illinois Central "was holding a large amount of land along the lake shore [between 11th Place and 51st Street] which it does not own." Responding to an inquiry by the secretary, the Attorney General (*Biennial Report and Opinions of the Attorney General of the State of Illinois,* 1916, at 1004, 1006) stated: "It is my understanding that the effect of said decrees [the 1912 Boundary Line Decrees] and the purpose of the acts, which are the basis of said proceedings and said decrees, was to establish a permanent boundary line on the submerged lands between the outer waterline of the park extension, or boulevard, or driveway, and the shore: * * * and to vest in the shore owner or owners title to that portion of the submerged lands from about said Park Row to Forty-ninth Street, and lying between said permanent boundary line, so agreed upon and decreed, and the shore: * * * Unless there be some jurisdictional defect in said proceedings and decrees, it seems to me these questions now sought to be raised by this complaint, and the claims of all persons of any title or interest to or in the shorelands between said points have been finally settled and adjudicated by said decrees, and that, in view of these decrees and of section 29 of the Rivers and Lakes Act, the Commission is now without jurisdiction to entertain this complaint."

The city of Chicago, in 1919, adopted an ordinance incorporating the 1912 boundary line agreement as amended and supplemented in 1913, and the railroad was authorized by the Public Utilities Commission of this State to accept the provisions of this ordinance, make the property transfers

therein contemplated and proceed with the agreed plan. While this ordinance is not before us, it seems to be conceded that its provisions required the Illinois Central to depress its tracks and electrify its operations, and that such action has been accomplished at a cost allegedly upwards of $60,000,000. Since this cost allegation is disputed and it is apparent that such cost would, in any event, not be wholly and perhaps not even largely attributable to the ordinance and agreement requirements as distinguished from self-interest considerations of efficient and economical railroad operations, we do not consider this a material factor.

In 1929 the city of Chicago adopted an ordinance in the form of an amendment to the 1919 lake front ordinance. We earlier in this opinion noted the park-connecting purpose of the 1929 ordinance and its provisions for streets, boulevards and viaducts in the north-of-Randolph area east of Michigan Avenue. It is of additional interest to note that this 1929 ordinance in its comprehensive plan for development of this area specifically recognized the right of the Illinois Central and the Michigan Central (which had purchased certain lands in the area from the Illinois Central and subsequently resold them to the Illinois Central) to develop their lands for other than railroad purposes and provided for the construction by the railroads, city, and park commissioners of elevated streets, alleys and viaducts. Certain conditions as to streets in this area were prescribed when 75% of the frontage thereon was to be used for other than railroad purposes, and provision was made as to the minimum clearance to be allowed between the roadway of alleys and any structures built thereover. Maximum height of such buildings was also regulated. The ordinance further provided for the institution of circuit court proceedings to confirm the boundary line as agreed upon by the two railroads, the city and the commissioners, and that upon confirmation by the court the Illinois Central should become the owner and have title to the submerged, penetrating, adjacent or

other lands on the shoreward side of the boundary line and might sell and convey, fill in or otherwise use them, and it was provided that the railroad, city and commissioners would execute and deliver deeds of conveyance in accordance therewith. We earlier noted the execution of the agreement and acceptance of the ordinance by the railroad, and this action was authorized and approved by the Illinois Commerce Commission in 1930 by an order recognizing ownership by the railroad of the lands occupied by it but specifically providing that the general permission to proceed with its ordinance obligations did not constitute permission to grant or convey easements, leases, air rights or other incumbrances and that as to the sale or lease of the air rights, specific application for authority to make each conveyance would be necessary.

The 1929 ordinance also provided that the city, the commissioners and the railroad should jointly petition the Secretary of War to change the harbor district line to coincide with the newly agreed upon boundary line, and the petition so filed represented that the lands on the shoreward side of the boundary line between Randolph Street and the Chicago River were "owned and controlled by the Illinois Central."

The city, in the 1930 boundary line proceedings, admitted the railroad's allegations of shore and riparian rights ownership, and subsequently quitclaimed to the railroad any interest it may have had in the property involved in the 1930 proceedings.

Of some significance is the fact that subsequent to the Lake Front Case and during the period from 1898 to the commencement of the instant litigation the city and several municipal subdivisions, including the Park Commissioners and Sanitary District, have negotiated various types of conveyances from the Illinois Central of portions of the lands with which we are concerned. These include grants of easements, licenses, leases and deeds in fee.

Since 1950, there have been an undisclosed number of sales, leases and options by the Illinois Central of land and air rights thereover, and buildings of very substantial value have been constructed pursuant thereto on and above the lands in question. In 1951 the Illinois Central sold to the Prudential Insurance Company certain air rights over and supporting caisson sites in the property originally sold to and repurchased from the Michigan Central, and Prudential erected a 41-story office building thereon, paying the Illinois Central some $2,270,000 for the grant. Both the purchase from the Michigan Central and sale to Prudential were approved in proceedings before the Illinois Commerce Commission of which the city and Chicago Park District were given notice. The order therein entered specifically found the Illinois Central after its purchase to be the "owner in fee" of the involved real estate. In 1959 a contract of sale of lands and air rights in the 23rd Street area for hotel purposes was made with Kabak Corporation for a total consideration approximating $1,500,000, and like proceedings were had before the Commerce Commission culminating in an order finding fee-simple title in the railroad and authorizing and approving the sale, but apparently no conveyance has yet been made. In 1962 a similar sale of air rights and supporting column sites was made to Interstate Investments, Inc. at a price of $2,750,000 and a 35-story apartment building was erected thereon. The Commerce Commission also approved and authorized this sale, finding the Illinois Central to be the fee-simple owner of the land and air rights involved. Other unconsummated contracts and options have been executed involving the lands before us.

In a suit in the circuit court of Cook County (No. 60 C 8252) seeking to compel the Illinois Central to rehabilitate the retaining wall along the south side of the river, the city alleged in its sworn pleadings that the railroad "was and still is the owner of" portions of the property now disputed. In a similar 1959 suit in the United States District Court

for the Northern District of Illinois, both the Attorney General of Illinois and the Corporation Counsel of Chicago were named as parties, and both were dismissed on their own motion. In its written opinion filed September 11, 1962, that court stated: "[d]uring the past fifty years all the attorneys general of Illinois, both quondam and present, have evinced a consistent attitude of disclaimer and disinterest on the part of the State of Illinois in the lands in question."

It is agreed by all parties that there have been some fifty other boundary line proceedings for undisclosed areas of the lake front in Cook County.

In addition to the foregoing, it is apparent that in the course of the various boundary line agreements, lawsuits and property exchanges the Illinois Central has permanently parted with any riparian rights and undisputed rights of access to some four and one-half miles of lake front from 11th Place to 49th Street.

We have elaborated upon the actions of the various governmental agencies and officials, not because they are, individually, of a conclusive nature, but in order to adequately demonstrate why it may fairly be said that the prevailing governmental attitude, both State and city, since near the beginning of this century has regarded the Illinois Central Railroad as the owner, in fee, of the now disputed lands. It is manifest that subsequent to the turn-of-the-century Lake Front Case, questions existed as to the extent of the respective State and railroad interests in these lands. While the State now attacks the validity of the 1912 and 1913 boundary line proceedings, it is clear that those proceedings were then regarded as conclusively establishing title to the lands, submerged and filled, between the boundary line thus established and the 1852 shoreline, in the Illinois Central. It is equally clear that the Michigan Central, prior to its 1951 conveyance to the Illinois Central, was regarded as owning the land so conveyed, and that the Illinois

Central was regarded as the owner of the reclaimed lands involved in the 1930 proceedings both prior and subsequent thereto.

We come then to a consideration of the vital question: If we assume to be correct the conclusions drawn by the plaintiffs as to deficiencies in the methods by which the State was divested of its original title to the off-shore lake bed, (and we do not mean to imply that they are,) is the State by its conduct prior hereto now barred from asserting its claim? If so, there is no reason for discussion of other issues. As this court has earlier observed: "* * * where a party by his statements or conduct leads another to do something he would not have done but for the statements or conduct of the other, the one guilty of the expressions or conduct will not be allowed to deny his utterances or acts to the loss or damage of the other party. The party claiming the estoppel must have relied upon the acts or representations of the other and have had no knowledge or convenient means of knowing the true facts." (*Dill* v. *Widman,* 413 Ill. 448, 455-56.) It is apparent that these elements are present here.

It is, of course, elementary that ordinary limitations statutes and principles of *laches* and estoppel do not apply to public bodies under usual circumstances, (19 Am. Jur., Estoppel, par. 166; 31 C.J.S., Estoppel, par. 138; 1 A.L.R. 2d 338, 340) and the reluctance of courts to hold governmental bodies estopped to assert their claims is particularly apparent when the governmental unit is the State. There are sound bases for such policy. It is said that since the State cannot be sued without its consent, an inevitable consequence is that it cannot be bound by estoppel. More importantly, perhaps, is the possibility that application of *laches* or estoppel doctrines may impair the functioning of the State in the discharge of its government functions, and that valuable public interests may be jeopardized or lost by the negligence,

mistakes or inattention of public officials. *United States* v. *California,* 332 U.S. 19, 91 L. Ed. 1889; *People* v. *Brown,* 67 Ill. 435, 438.

But it seems equally true that the reluctance to apply equitable principles against the State does not amount to absolute immunity of the State from *laches* and estoppel under all circumstances. The immunity is a qualified one and the qualifications are variously stated. It is sometimes said *laches* and estoppel will not be applied against the State in its governmental, public or sovereign capacity (*People ex rel. Barrett* v. *Bradford,* 372 Ill. 63), and it cannot be estopped from the exercise of its police powers or in its power of taxation or the collection of revenue. *People* v. *Levy Circulating Co.* 17 Ill.2d 168, 175; *People* v. *Illinois Women's Athletic Club,* 360 Ill. 577, 579-80; *People ex rel. Smith* v. *Woods,* 354 Ill. 224; *State* v. *Illinois Central Railroad Co* 246 Ill. 188.

It has, however, been stated with frequency that the State may be estopped when acting in a proprietary, as distinguished from its sovereign or governmental, capacity (1 A.L.R. 2d 338, 346-7; *Brown* v. *Trustees of Schools,* 224 Ill. 184, 186; *Jordan* v. *City of Chenoa,* 166 Ill. 530, 536,) and even, under more compelling circumstances, when acting in its governmental capacity. The rule in this State, as repeatedly announced by this court, is stated in *City of Quincy* v. *Sturhahn,* 18 Ill.2d 604, 614; "While situations may arise which justify invoking the doctrine of estoppel even against the State when acting in its governmental capacity, [citation] we have always adhered to the rule that mere nonaction of governmental officers is not sufficient to work an estoppel and that before the doctrine can be invoked against the State or a municipality there must have been some positive acts by the officials which may have induced the action of the adverse party under circumstances where it would be inequitable to permit the corporation to stultify itself by retracting what its officers had previously

done. [Citing cases.] In applying the doctrine of estoppel, the courts will not decide the question by mere lapse of time but by all the circumstances of the case, and will hold the public estopped or not as right or justice may require. [Citing cases.] The doctrine is invoked only to prevent fraud and injustice. [Citation]." (See also *People ex rel Barrett* v. *Bradford,* 372 Ill. 63, 74 (dissenting opinion) ; *People ex rel. Petty* v. *Thomas,* 361 Ill. 448, 456; *Trustees of Schools* v. *Village of Cahokia,* 357 Ill. 538, 543 ; *Webster* v. *Toulon Township High School District,* 313 Ill. 541, 547-48; *Melin* v. *Community Consolidated School District,* 312 Ill. 376, 384; *Village of Itasca* v. *Schroeder,* 182 Ill. 192, 214; *City of Carlinville* v. *Castle,* 177 Ill. 105, 109; *Board of Supervisors of Logan County* v. *City of Lincoln,* 81 Ill. 156, 159; *Chicago, Rock Island and Pacific Railroad Co.* v. *City of Joliet,* 79 Ill. 25, 39; *Martel* v. *City of East St. Louis,* 94 Ill. 67, 69-70; *People ex rel. Village of Colfax* v. *Maxon,* 139 Ill. 306, 310.) Certainly, no private party would be permitted now to challenge titles to real property concerning which he had theretofore, by both overt action and passive acquiescence encouraged and allowed others to rely on for lengthy periods of time, and the question to be answered is whether the reasons underlying the reluctance to extend doctrines of estoppel and *laches* to governmental bodies outweigh the mischief which may result from recognizing a right in the State officially disclaimed for half a century.

In the context of the extraordinary circumstances here prevailing we believe basic concepts of right and justice preclude the State from now asserting any claim to the lands involved in these proceedings. For a period of more than fifty years, all governmental bodies, including numerous Attorneys General and various other agencies of the State of Illinois, together with representatives of the city of Chicago, have consistently disclaimed any interest in the lands, title to which is now asserted, and have continuously acted

as if they were owned in fee by the Illinois Central. Only after this cause was pending in this court on the first appeal herein did the Attorney General seriously maintain the contrary.

Meanwhile, numerous other lake shore boundary line agreements have been consummated and confirmed, conveyances made, leases executed and options granted; proposals for lake shore development were agreed upon and accepted whereby substantial construction obligations were apportioned as between the city, Park Commissioners and the railroad in reliance upon the assumption that the railroad was the fee owner of the lands it occupied; the railroad has permanently parted with its right of access to the lake shore throughout the major portion of the area here involved, and to permit so belated a claim to be raised now as to real estate titles regarded for many years as securely established would promote confusion and uncertainty in an area where it can be least tolerated.

The judgment of the circuit court of Cook County is affirmed.

*Judgment affirmed.*