THE FIRST NATIONAL BANK OF SPRINGFIELD, Trustee, Petitioner-Appellant, *v.* THE POLLUTION CONTROL BOARD *et al.*, Respondents-Appellees.

Fourth District   No. 13027

Opinion filed April 15, 1976.

Giffin, Winning, Lindner, Newkirk, Cohen, Bodewes & Narmont, of Springfield (Robert S. Cohen, of counsel), for petitioner.

William J. Scott, Attorney General, of Springfield (Larry R. Eaton, Assistant Attorney General, of counsel), for respondents.

Mr. PRESIDING JUSTICE TRAPP delivered the opinion of the court:

Petitioner appeals from an order which denied a variance that would permit a sewer connection. One member of the Pollution Control Board dissented. Petitioner's motion to reconsider was denied. The latter appeals pursuant to Section 41 of the Environmental Protection Act (Ill. Rev. Stat. 1973, ch. 111½, par. 1041).

The issues raised here include whether the finding of the Pollution Control Board that enforcing the sewer ban did not impose an arbitrary

and unreasonable hardship upon petitioner was contrary to the manifest weight of the evidence, and whether the Environmental Protection Agency and Pollution Control Board are estopped by their own actions from denying a variance to petitioner.

Petitioner holds title, as trustee, for two individuals who purchased the tract of land on March 1, 1972, for purposes of developing multifamily dwellings.

The project was designed to proceed in two phases. Phase I was designed for 144 residential units, a swimming pool, recreational and party facilities, and a laundromat. Phase I also included construction of sewer lines, water and electric facilities for the entire project. Construction of Phase I began in March, 1972, and was completed in the latter part of 1972.

Phase II was designed for 76 residential units (three buildings containing 24 units each, a fourth building containing four units). Construction began on Phase II in early 1973. Construction of Phase II was approximately 65 percent complete by October, 1973, and was finally completed in April, 1974.

At the time of the purchase in 1972, there was no sewer ban in the area and hence no bar to construction. However, the Illinois Environmental Protection Agency (hereinafter the "Agency"), imposed a sewer ban in the southwest portion of Springfield on July 12, 1972. The ban prohibited any further construction or installation of sewers in the area. During that same month, petitioner's application for a permit to construct and connect its Phase I sewers was denied, and on July 20, 1972, petitioner filed a variance petition with the Pollution Control Board (hereinafter the "Board"), to permit it to operate sewers for both Phases I and II. Construction of Phase II had not begun as of that time.

On August 18, 1972, the Agency filed with the Board its "Recommendation" (a pleading responsive to the variance petition), in the variance case, recommending that the variance for Phase I be granted, due to the pre-ban construction of that phase, and denied as to Phase II, due to the fact that no Phase II construction had been commenced as of the time of the ban's commencement on July 12, 1972.

On August 29, 1972, after the Board's hearing on petitioner's variance request but before its ruling, the Manager of the Division of Water Pollution Control in the Agency, wrote a letter to the Springfield Sanitary District advising of the Agency's determination "to issue a limited number of 'conditional installation' sewer permits" in the area. These permits, the letter said, "will allow connection of new sewers to the system when the new treatment plant [at that time under construction] is completed and in operation."

On September 1, 1972, an attorney of the Agency, transmitted a copy of

the August 29 letter to counsel for petitioner. An accompanying letter suggested that, in the light of the Agency letter, petitioner might wish to apply for a conditional installation permit, and, if that was granted, withdraw the petition for a variance.

The Agency amended its recommendation on September 18, 1972. It then recommended the granting of a variance for the entire project. The amendment recited:

"The Agency has determined, on the basis of the District's program and the results achieved to date, that the overload problem of the Outer Park Interceptor Sewer has been substantially alleviated and is now willing to issue conditional installation permits for construction in the area tributary to opinion in #72-300, which has led the Agency to agree to *issue permits allowing construction, with connection to be made upon completion of treatment plant expansion in the spring of 1973*. There is no evidence or allegation that connections will be needed before then for the units not yet under construction * * * and no suggestion that such an install-only permit will be insufficient to fulfill the petitioner's needs as to those units. As in #72-300, therefore, the petition is moot with regard to units not under construction when the ban was imposed." (Emphasis supplied.)

The order specified, in part:

"With respect to buildings not under construction as of the date of the sewer connection ban the petition is hereby dismissed as moot."

Petitioner applied for a conditional permit for Phase II, attaching thereto a document signed by the Director of the Springfield Sanitary District. This document stated that completion of a new sewage treatment plant to go into operation in the spring of 1973 would ensure adequate transportation capacity in the problem area. The Agency issued a conditional permit for Phase II on December 21, 1972.

Thereafter, in February of 1973, petitioner recontacted suppliers and subcontractors and announced readiness to commence construction, obtained mortgage financing and began construction on Phase II, consisting of 72 units. There is some conflict in testimony as to how much construction was undertaken prior to March 15, 1973. It is apparent that at least the groundwork on Phase II was completed by that date.

On March 15, 1973, before the operation of the new plant commenced, the Agency notified the District by letter of the continuation of the overflow problems and of the Agency's resultant determination to discontinue its practice of issuing "install-only" permits. This letter was sent to the Springfield Sanitary District but was not sent to, nor seen by, petitioner until shortly before trial in this case.

On April 30, 1973, the Springfield Sanitary District wrote to the clerk of the City of Springfield, with a copy to petitioner, indicating that adequate sewers were available to serve petitioner's development. The new treatment plant began operation in June of 1973.

Then in October of 1973, an agent of appellant discovered a newspaper article announcing a meeting between the Springfield Sanitary District and the Environmental Protection Agency to discuss the sewer ban then imposed. Petitioner's agent attended the meeting and for the first time learned that there might be a problem in obtaining operating permits for Phase II. At that time construction on Phase II was 65 percent completed and winter was approaching. Petitioner determined to proceed with its construction inasmuch as curtailment would have resulted in a total loss of the improvements theretofore built.

In December, a meeting was held between the Springfield Sanitary District, the Environmental Protection Agency and the City of Springfield, attended by engineers and attorneys. The District offered to construct and install a pump to environmental protection standards and specifications. It was intended that this pump provide 2½ million to 3 million additional gallons of additional capacity per day in the sewers. The load contemplated to be emitted from Phase II of petitioner's project is 22,400 gallons per day. It was agreed at the meeting that an attorney for the Agency would draw up an agreement concerning installation of such a pump and send that agreement to the attorney for the Sanitary District. As of the time of the hearing, plans had been submitted but not acted upon by the Environmental Protection Agency.

Petitioner has stipulated that the sewer system as it exists in the area during times of severe rainfall continues to suffer basement backups and manhole overflows, and that such overflows contain domestic sewage. It does dispute the claim of a health hazard in the context that the Illinois Department of Public Health has never received any report as to matters of communicable disease and was unaware of a problem of sewage overflow in the area.

Section 35 of the Environmental Protection Act (Ill. Rev. Stat. 1973, ch. 111½, par. 1035) authorized the grant of individual variances "whenever it is found, upon presentation of adequate proof, that compliance with any rule or regulation, requirement or order of the Board would impose an arbitrary or unreasonable hardship." It is essentially undisputed that petitioner is committed to mortgage obligations in the amount of $1,830,000 as to Phase I of the development, and in the sum of $970,000 as to Phase II. In addition to the mortgages, trust beneficiaries have individually borrowed $136,000 and $140,000 at 10 percent interest and together as a joint venture, have borrowed the further sum of $150,000 at 10½ percent interest. Upon the equity loans of the individuals in the sum

of $426,000, there is annual interest in the sum of $44,800. As to the entire project consisting of Phase I and the unused Phase II, there is for practical purposes a net loss of $8,360 per month, or in all approximately $100,000 per year. The computation does not include payment of principal. The record shows that petitioner has paid a fee or commission to obtain the mortgages in the amount of $20,000 and has paid to the Sanitary District for permit to tap the sewer, fees in the sum of $15,200.

The Board found that there was a "considerable economic loss" to the beneficiaries but that there was no irreparable financial loss which would result in the bankruptcy of the trust beneficiaries.

■■ In *Bederman v. Pollution Control Board*, 22 Ill. App. 3d 31, 35, 316 N.E.2d 785, it is said:

> "Neither the courts nor administrative bodies may set up a dollar figure as to what constitutes financial hardship."

Neither party has cited, nor can we discover, any authorities which establish a specific measure or standard of economic loss which aids in determining the hardship contemplated by a statute. We do not, however, concur in a precedent that establishes inevitable bankruptcy as the standard of economic hardship which permits a variance. Similarly, the Board found that as to the claim that the petitioner might be bankrupt by continuing losses, "No testimony was presented to indicate that the venture could not be sold to recover the alleged loss of investments." In the light of the record such conclusion as to the marketability of this venture is singularly unpersuasive.

The Board finds that the development of events does not sufficiently establish petitioner's reliance to require the granting of the variance for sewer connections as to Phase II. A letter of the Agency dated March 15, 1973, to the Sanitary District in effect reimposed the ban on sewer connections. At that time there were four holders of conditional permits to connect. No copy of the letter and no notice was sent to petitioners. The Board finds that:

> "It is regrettable that the Agency did not send notice to all holders of conditional permits. * * * However, such notice is not mandatory."

The Board further finds that the conditional permit gave sufficient notice that potential problems existed in obtaining an operating permit, and that the petitioner could not rely upon a document sent to the Sanitary District "without once seeking to determine if contrary documents exist." This ignores the cited critical documents sent to petitioner.

In the context of notice we note that the amended recommendation of the Agency states that the initial ban of July 12, 1972, upon sewer connections in the area was announced publicly by the letter to the mayor of Springfield and the president of the Sanitary District, which

letters were released to the news media. The document stated, "This letter constituted the first public notice that the Agency would not issue sewer permits in the area." From such one may conclude that the concept of notice by the Agency of significant actions is recognized as of public value, and that the procedure for giving notice is not foreign to administrative procedures.

No cases cited in the brief of counsel encompass the issues or embrace the facts presented here. In *Bederman v. Pollution Control Board*, 22 Ill. App. 3d 31, 316 N.E.2d 785, and *Kaeding v. Pollution Control Board*, 22 Ill. App. 3d 36, 316 N.E.2d 788, the Board issued cease and desist orders as to the connection of sewers. It was held that the Board was estopped to revoke or withdraw prior unconditional connection permits granted by its predecessor in authority. In *Wachta v. Pollution Control Board*, 8 Ill. App. 3d 436, 289 N.E.2d 484, the Board denied a variance sought after its order had, in effect, revoked a prior permit issued by the Board's predecessor. It was held that the Board was estopped from issuing such order.

This court has affirmed the action of the Board in denying permits in *Springfield Marine Bank v. Pollution Control Board*, 27 Ill. App. 3d 582, 327 N.E.2d 486, and *Springfield Marine Bank v. Pollution Control Board*, 27 Ill. App. 3d 964, 327 N.E.2d 492. We find a substantial distinction in each case from the facts in this record in that in each of those cases the petitioner had obtained only a conditional permit and from such fact alone proceeded to incur expense upon the assumption or belief that permits to connect would follow without more.

■■ In this case each agency took affirmative action which could reasonably be determined to induce petitioner to rely upon such action. The Agency, by its amended recommendation of September, 1972, recited that the completion of a new sewage treatment plant in March, 1973, would provide sufficient capacity to authorize a variance to complete the project. The Board, by its opinion of October, 1972, in effect adopted such recommendation and recited that the Agency might issue permits for construction "with connection to be made upon completion of treatment plant expansion in the spring of 1973". It further dismissed the petition for a variance as moot saying that the "install-only permit" was sufficient for petitioner's present needs. Thereafter, in February or March, 1973, petitioner incurred its mortgage and construction obligations. No notice of respondents' reversal of position was given to petitioner until a public meeting announced through the newspaper in October, 1973. So far as the record shows it was not even then announced at the meeting that permits would be denied, but rather the Agency took further solutions to the problem in cooperation with other municipalities.

We find that the record discloses such affirmative acts by the

respondents that the authority of *Wachta v. Pollution Control Board*, 8 Ill. App. 3d 436, 440, 289 N.E.2d 484, is to be applied. That court said:

"We perceive no unique exception to the application of the principle of estoppel, in the proper case, to the Pollution Control Board or the Environmental Protection Agency. They are subordinate agencies of the State with broad powers which may not be arbitrarily exercised and with responsibilities which must be carried out in a manner consistent with right and justice. Should the officials of these agencies by their authorized, positive acts create a situation where it would be inequitable to permit them to retract what they have done, the doctrine of estoppel may be applied against them wherever the circumstances require it."

Such determination is consistent with that in *Hickey v. Illinois Central R.R. Co.*, 35 Ill. 2d 427, 220 N.E.2d 415, and *Stahelin v. Board of Education*, 87 Ill. App. 2d 28, 230 N.E.2d 465.

Upon such record we must conclude that the Board's denial of a variance by reason of hardship was against the manifest weight of the evidence and hence arbitrary and unreasonable, and that the respective respondents performed such affirmative acts as to properly invoke the doctrine of estoppel to deny the variance sought by petitioner.

The order of the Board denying a variance is reversed, and the cause is remanded for further proceedings not inconsistent with the views expressed herein.

Reversed and remanded, with directions.

GREEN and SIMKINS, JJ., concur.