THE PEOPLE *ex rel.* NEIL F. HARTIGAN, Attorney General, Plaintiff-Appellant, v. PROGRESSIVE LAND DEVELOPERS, INC., *et al.*, Defendants-Appellees.

First District (4th Division)   No. 1—90—1006

Opinion filed June 20, 1991.—Rehearing denied August 14, 1991.

Neil F. Hartigan, Attorney General, of Springfield (Floyd D. Perkins, Matthew D. Shapiro, and Thomas P. James, Assistant Attorneys General, of counsel), for appellant.

Rufus Cook, of Cook Partners Law Offices, Ltd., of Chicago, for appellees.

PRESIDING JUSTICE JIGANTI delivered the opinion of the court:

The plaintiff, the Illinois Attorney General, filed suit against the defendant, Progressive Land Developers, Inc., attempting to recover charitable assets on a theory of unjust enrichment. The suit also sought the imposition of a constructive trust. Progressive Land Developers made a motion to dismiss on the grounds of *res judicata, laches*, estoppel and the statute of limitations. The trial court dismissed the lawsuit on the basis of *res judicata*, expressing reasoning that would also support the theory of *laches*.

This litigation involves the estate of Elijah Muhammad, the leader of a religious organization known as the Nation of Islam (Nation). The Nation itself is not a legal entity, but is administered by a not-for-profit corporation called Muhammad Mosque No. 2, Inc. (Mosque). Funds collected from the members of the Nation were placed into an account denominated the Poor Fund Account, which was controlled by Elijah Muhammad. Funds from the Poor Fund Account were used for the purposes of the Nation and were also used by Elijah Muhammad personally. According to the Attorney General's complaint, money from the Poor Fund Account was used to establish Progressive Land Developers. The ownership of the Poor Fund Account at the time of Elijah Muhammad's death and the use of that money to establish Progressive Land Developers provides the focus of this appeal. The relationship between the estate of Elijah Muhammad, the Poor Fund Account and Progressive Land Developers will be developed at some length, along with the actions of the Attorney General.

Elijah Muhammad died in 1975, survived by several children (the Estate). In 1980, the Estate filed a 12-count citation petition seeking to recover property allegedly belonging to the Estate. Counts I and III of the citation petition are pertinent to the instant lawsuit. In count I, the Estate sought to recover a balance in the Poor Fund Account in excess of $3 million. Count III was directed against Progressive Land Developers. Count III asserted that Progressive was incorporated but that no stock was ever issued and that Elijah Muhammad made all of the capital contributions to Progressive from his own personal and individual funds. It further alleged that following Elijah Muhammad's death, Progressive allowed the management and operation of its assets "by other than the ESTATE." Among the relief requested was an accounting.

Although count I is not directly involved in this lawsuit, a brief history of the litigation involving that count is essential to an understanding of the issue before us. In count I, the Estate sued First Pacific Bank to recover funds remaining in the Poor Fund Account which the bank had turned over to the new leader of the Nation. The Estate's theory was that the funds constituted gifts made to Elijah Muhammad personally and should not have been given to the Nation. The bank filed a third-party claim against the Nation seeking indemnity and served the Attorney General on May 5, 1981, on the basis that the funds constituted charitable assets held for the poor and needy and that the Attorney General had a duty to safeguard such assets.

On May 27, 1981, the Attorney General filed a general appearance in the probate proceeding and subsequently participated fully in the litigation involving the Poor Fund Account. The litigation involved two trials and two appeals to this court. (*In re Estate of Muhammad* (1984), 123 Ill. App. 3d 756, 463 N.E.2d 732 (*Muhammad I*); *In re Estate of Muhammad* (1987), 165 Ill. App. 3d 890, 520 N.E.2d 795 (*Muhammad II*).) In a "Statement of Position" filed in the first trial, the Attorney General, arguing that the Poor Fund Account constituted charitable assets, stated as follows:

> "Absent a showing that the Honorable Elijah Muhammad had a source of income other than monies received by virtue of being the leader of the Nation of Islam, it must be presumed that the sole source of income of the Honorable Elijah Muhammad was as the Leader of the Nation of Islam. Such monies were thus given to further the causes and charitable purposes expressed by Elijah Muhammad."

The trial court in July of 1986 held that the monies in the Poor Fund Account were gifts to Elijah Muhammad and that he was the equitable owner of the account. In his brief before this court in *Muhammad II*, the Attorney General represented that he had "intervened in the original proceedings under his common-law power and authority to safeguard charitable assets and preserve charitable trusts." The litigation over the Poor Fund Account was ultimately resolved against the Estate and in favor of the position taken by the Attorney General when this court held in 1987 in *Muhammad II* that monies in the account, having been solicited in the name of charity, constituted charitable assets rather than personal property of Elijah Muhammad.

On January 11, 1983, while the litigation was proceeding through the courts, the Estate filed the "Administrator's First Petition for Recovery Citation" against the Mosque, the Nation and certain individual defendants (hereinafter collectively referred to as the Nation). Essentially, like count III of the 1980 citation petition, the petition sought to recover funds and assets held by Progressive. The petition recited that at the time of his death, Elijah Muhammad and his sons owned all of Progressive's stock and that the Nation had improperly seized control of Progressive, sold substantial portions of its assets and misappropriated the proceeds. Although the Attorney General was not served a summons in this proceeding, he was mailed a copy of the petition. On July 22, 1983, the Nation filed an amended answer to the petition alleging that Progressive was formed in 1963 by Elijah Muhammad aided by three of the Nation's trustees "with the sole intent of furthering The Nation's financial growth." The answer alleged that "The Nation was intended to be the sole shareholder of Progressive Land. *Money to form, finance, and operate Progressive Land came from the members of The Nation who lived throughout the United States.* \*\*\* [Elijah Muhammad] was never a shareholder in Progressive Land, but only acted as an official to operate Progressive Land on behalf of all the members of The Nation." (Emphasis added.) The Attorney General was mailed a copy of the amended answer.

The Attorney General was mailed several other pleadings in the Progressive litigation, including a motion for a preliminary injunction filed by the Estate to enjoin the Nation from selling Progressive's assets "until such time as there has been a final adjudication by this court relative to the equitable ownership of Progressive Land Developers, Inc." The mailings stopped on September 21, 1983, and the Attorney General did not receive the third-amended petition on which the trial was based or any of the post-trial filings and motions.

The trial involving the ownership of Progressive began in March of 1984 and lasted approximately one month. The trial court initially refused the Nation the opportunity to present evidence showing that Progressive was formed with contributions to Elijah Muhammad from members of the Nation. It was the court's position that the theory of a constructive trust was not sufficiently pleaded by the Nation. However, when the court indicated that the Nation need only amend the pleadings to include that theory, counsel for Progressive withdrew his objection and the issue of equitable ownership of Progressive was fully litigated.

In November of 1986, while the litigation involving the Poor Fund Account was pending on appeal, the trial court entered a judgment in favor of the Estate and against the Nation in the amount of $12,975,907.50. The court specifically found that Progressive was formed in large part with funds from the Poor Fund Account and that the monies in the account were the personal property of Elijah Muhammad. An appeal by the Nation was dismissed by this court as untimely, and the supreme court denied leave to appeal. Following the dismissal of the appeal, the Estate and the Nation conducted extensive negotiations and entered into a settlement agreement on August 31, 1988.

On October 20, 1988, nearly two years after the judgment in the Progressive case and almost one year after our decision in *Muhammad II*, the Attorney General filed his unjust enrichment claim against Progressive. The complaint alleged that Elijah Muhammad used money from the Poor Fund Account to purchase real estate and then placed the title to the real estate in Progressive. The complaint further alleged that Elijah Muhammad completely controlled Progressive and used its assets for the charitable purposes of the Nation. In the dispute between the Estate and the Nation over ownership of Progressive's stock after Elijah Muhammad's death, the trial court held that Progressive was funded with Elijah Muhammad's personal assets and that equitable ownership of Progressive therefore rested in the Estate. The complaint alleged that this finding was erroneous in light of this court's opinion in *Muhammad II*, which held that monies in the Poor Fund Account were charitable assets. The Attorney General requested the court to impose a constructive trust on the charitable assets placed in Progressive by Elijah Muhammad.

Progressive filed a section 2—619 motion to dismiss (Ill. Rev. Stat. 1989, ch. 110, par. 2—619) alleging that the unjust enrichment suit was barred by *res judicata, laches,* estoppel and the statute of

limitations. The trial court granted the motion to dismiss. In denying reconsideration, Judge Curry made the following statements:

"The Attorney General here was barred in this action by res judicata, as simple and straightforward a case of res judicata as could be imagined, set in a convoluted and complex fact situation, but res judicata as Illinois case law describes it, pure and simple.

The issue before the trial judge was resolved in a fashion that the Attorney General does not agree with. The issue and the resolution by the probate court was never appealed. Whether the determination by the probate court was right or wrong is irrelevant because it's final.

The Attorney General then says well, I wasn't a part of that. I didn't participate. No one expected me to participate. No one invited me to participate. I didn't participate. I'm not bound. When the Attorney General files a general appearance, the law is clear that he's in the case for all reasons and is bound by all determinations.

So when I say that this is a classic case of res judicata, that's exactly what it is. The extensive briefing, the convoluted proceedings and the zeal to have a different result do not detract from the realities that simple law, well-established law in Illinois dictates the result that was delivered by this court in May of last year."

On appeal, the Attorney General contends that the instant unjust enrichment suit is not barred by *res judicata* because it involves different issues than the earlier citation proceeding. The Attorney General also contends that he was neither a party nor in privity with a party to the citation proceeding.

■ Essentially, the doctrine of *res judicata* provides that a final judgment on the merits rendered by a court of competent jurisdiction is conclusive as to the rights of the parties and their privies and, as to them, constitutes an absolute bar to a subsequent action involving the same claim, demand or cause of action. (*Spiller v. Continental Tube Co.* (1983), 95 Ill. 2d 423, 432, 447 N.E.2d 834.) The doctrine is designed to protect litigants from the burden of retrying an identical cause of action or issue with the same party or privy and to enhance judicial economy by prohibiting repetitive litigation. (*People v. Bone* (1980), 82 Ill. 2d 282, 286, 412 N.E.2d 444, *cert. denied* (1981), 454 U.S. 839, 70 L. Ed. 2d 120, 102 S. Ct. 145.) The doctrine of *res judicata* applies "not only to what actually was decided in the original action but also to matters which could have been decided in that

suit." *La Salle National Bank v. County Board of School Trustees* (1975), 61 Ill. 2d 524, 529, 337 N.E.2d 19, 22, *cert. denied* (1976), 425 U.S. 936, 48 L. Ed. 2d 177, 96 S. Ct. 1668.

In determining whether two lawsuits involved the same claim, demand or cause of action for purposes of applying *res judicata,* Illinois courts have examined whether the suits arise out of "a single group of operative facts." (*Radosta v. Chrysler Corp.* (1982), 110 Ill. App. 3d 1066, 1069, 443 N.E.2d 670, 673.) In determining whether the party in the subsequent litigation was in privity with a party to the earlier litigation, Illinois courts have often looked to the following definition of privity provided in the Restatement of Judgments:

> "Privity is a word which expresses the idea that as to certain matters and in certain circumstances persons who are not parties to an action but who are connected with it in their interests are affected by the judgment with reference to interests involved in the action, as if they were parties." (Restatement of Judgments §83, Comment *a,* at 389 (1942).)

(*Johnson v. Nationwide Business Forms, Inc.* (1981), 103 Ill. App. 3d 631, 634, 431 N.E.2d 1096; *Country Mutual Insurance Co. v. Regent Homes Corp.* (1978), 64 Ill. App. 3d 666, 670, 380 N.E.2d 516; *Upper Lakes Shipping Ltd. v. Seafarers' International Union of Canada* (1963), 40 Ill. App. 2d 392, 401, 189 N.E.2d 753.) In *Nationwide Business Forms,* the court interpreted this definition as meaning that "a nonparty may be bound if his own interests are so closely aligned to a party's interests that the party is his virtual representative." *Nationwide Business Forms,* 103 Ill. App. 3d at 634, 431 N.E.2d at 1098.

Applying these principles to the case at bar leads us to conclude that the trial court was correct in ruling that the Attorney General's unjust enrichment suit is barred by *res judicata.* The defense made by the Nation in the citation proceeding and the claim made by the Attorney General in the instant litigation are the same, *i.e.,* that monies used to form Progressive came from the members of the Nation and therefore constituted charitable assets. Thus, both lawsuits arose out of the same group of operative facts and involved the same claim or demand regarding the ownership of Progressive.

With regard to the "same party" requirement, we believe that the facts showed that the Attorney General was in privity with the Nation. As stated above, a nonparty may be bound by a judgment if its interests were so closely aligned to a party's interests that the party was the nonparty's virtual representative. (*Nationwide Business Forms,* 103 Ill. App. 3d 631, 431 N.E.2d 1096.) The Nation in

the citation proceeding took the position that assets held by Progressive constituted charitable assets, thereby asserting the public interests in preserving those assets. The Attorney General in the unjust enrichment suit took an identical position. Although the Attorney General argues that he was not aware of the citation proceeding and was therefore not able to fully present his position, the record does not support this argument. To allow the Attorney General's action to proceed now would be to undermine the purpose of the doctrine of *res judicata*, which is to avoid repetitive litigation of the same issue by giving conclusive effect to a prior judgment.

■ The doctrine of *laches* also operates to bar the Attorney General's claim. *Laches* is an equitable principle which operates to bar an action where, because of the plaintiff's unreasonable delay in bringing suit, the defendant has been misled or prejudiced or has taken a course different from what he would have otherwise taken. (*Hippert v. O'Grady* (1981), 97 Ill. App. 3d 310, 312, 423 N.E.2d 228.) No absolute rule governs when *laches* should apply, and what facts will combine to constitute *laches* depends upon the circumstances of each case. (*Eckberg v. Benso* (1989), 182 Ill. App. 3d 126, 132, 537 N.E.2d 967.) To establish unreasonable delay, the plaintiff must show that the defendant failed to seek prompt redress after acquiring knowledge of the fact supporting his claim. (*Eckberg v. Benso*, 182 Ill. App. 3d 126, 537 N.E.2d 967.) However, it is not necessary that the plaintiff have actual knowledge of the specific facts upon which his claim is based. If the circumstances are such that a reasonable person would make inquiry concerning these facts, the plaintiff will be charged with *laches* if he fails to ascertain the truth through readily available channels. *Eckberg v. Benso*, 182 Ill. App. 3d 126, 537 N.E.2d 967.

In the case at bar, the Attorney General argues that his delay in filing the unjust enrichment suit is not unreasonable because he did not know until early in 1988 that there was a dispute concerning the equitable ownership of Progressive's assets. We are not persuaded by this argument. The record reveals that in 1980 the Estate filed a 12-count citation proceeding seeking to recover funds and assets allegedly belonging to the Estate. The Attorney General was made a party to count I, involving the Poor Fund Account, and filed a general appearance in the probate proceeding. The Attorney General participated fully in the litigation over the Poor Fund Account and specifically adopted the position that unless it could be shown that Elijah Muhammad had a source of income other than contributions from the Nation, the monies were "given to further the causes and charitable purposes expressed by Elijah Muhammad."

Progressive was named as a citation respondent in count III of the 1980 petition. Although that count was abandoned, the Estate in 1983 filed a complaint against the Nation claiming that the Nation had improperly seized the assets of Progressive. The Attorney General was mailed a copy of the original complaint as well as the Nation's answer, which stated that "[m]oney to form, finance and operate Progressive Land came from the members of The Nation" and that Elijah Muhammad operated Progressive "on behalf of all the members of The Nation." These pleadings were filed during the pendency of the Poor Fund Account litigation, which involved a dispute over the equitable ownership of funds contributed to Elijah Muhammad by the members of the Nation. In light of this knowledge, we believe that it was incumbent upon the Attorney General to investigate the dispute involving Progressive's funds and assets and decide whether the facts were sufficient to warrant a claim that they constituted charitable assets.

■ The Attorney General then maintains that even if the delay was unreasonable, the doctrine of *laches* does not apply to the instant claim for unjust enrichment because the claim was brought by the State in the discharge of its governmental actions. It is true as a general proposition that *laches* will not be applied against the State when acting in its governmental capacity. (*Hickey v. Illinois Central R.R. Co.* (1966), 35 Ill. 2d 427, 448, 220 N.E.2d 415, *cert. denied* (1967), 386 U.S. 934, 17 L. Ed. 2d 806, 87 S. Ct. 957.) The reason supporting this general proposition is that application of *laches* could result in valuable public interests being jeopardized or lost by the negligence or inattention of public officials. (*Hickey*, 35 Ill. 2d 427, 220 N.E.2d 415.) It has therefore been stated that mere nonaction by government officials is insufficient to justify invoking *laches* against the State; there must be some positive act which induced the defendant to act to his detriment. In *Hickey*, the court stated that "the question to be answered is whether the reasons underlying the reluctance to extend doctrines of estoppel and *laches* to governmental bodies outweigh the mischief which may result from [the State's conduct]." *Hickey*, 35 Ill. 2d at 449, 220 N.E.2d at 426-27.

■ In our view the instant fact situation shows more than mere nonaction or inattention on the part of the State. As stated earlier, the Attorney General had knowledge as early as 1981 when it was made a party to the original citation proceeding that there was a dispute over whether funds held by Elijah Muhammad at his death belonged to him personally or the Nation under the theory of constructive trust. The Attorney General intervened in the probate

proceedings and participated fully in the litigation concerning the Poor Fund Account. Yet, the Attorney General did not make any claim to Progressive's assets despite knowledge that the Nation was claiming ownership of the assets on the theory that the money used to purchase them came from contributions by the Nation's members. By actively pursuing the Poor Fund litigation while ignoring the controversy over Progressive, the Attorney General led Progressive to believe that the State did not consider Progressive's assets to be charitable in nature. Progressive thus fully litigated the issue of ownership with the Nation, won a judgment in its favor and entered into a settlement agreement fully resolving all of the issues between the parties. Considering all of the circumstances set forth above, we believe that the Attorney General's lawsuit was barred by the doctrine of *laches*.

Accordingly, the judgment of the circuit court is affirmed.

Affirmed.

LINN and McMORROW, JJ., concur.