MONTGOMERY WARD LIFE INSURANCE COMPANY, Plaintiff-Appellant, *v.* THE DEPARTMENT OF LOCAL GOVERNMENT AFFAIRS, Defendant-Appellee.

First District (5th Division)  ·No. 79-1612

Opinion filed September 26, 1980.

Henry DeVos Lawrie and Frank P. Vanderploeg, both of Hopkins, Sutter, Mulroy, Davis & Cromartie, of Chicago, for appellant.

William J. Scott, Attorney General, of Chicago (Imelda Terrazino, Assistant Attorney General, of counsel), for appellee.

Mr. JUSTICE MEJDA delivered the opinion of the court:

Montgomery Ward Life Insurance Company (Ward Life) brought this action to review the 1977 assessment of its capital stock by the Department of Local Government Affairs (the Department) pursuant to the Revenue Act of 1939 (Ill. Rev. Stat. 1977, ch. 120, pars. 482 through 811).[1] Ward Life challenged the Department's inclusion of certain Government National Mortgage Association (GNMA) securities (Ginnie Maes) in the assessment of its capital stock. The trial court upheld the Department's position and this appeal followed. The issues on appeal are: (1) whether Ginnie Maes are obligations of the United States which are exempt from State taxation; and (2) assuming that the Ginnie Maes are not exempt, is the Department precluded from assessing the Ginnie Maes because of its published assessment standards set forth in the Illinois Property Tax Manual.

On May 31, 1977, Ward Life filed its Intangible Property Return for 1977 with the Department. On November 11, 1977, the Department informed Ward Life that its capital stock had been assessed at $2,298,000 which was almost 10 times its value in the previous two years. Ward Life filed a complaint with the Department and upon review the value was determined to be $1,349,000. Ward Life appealed from the revised assessment and an administrative hearing was held on April 6, 1978. Ward Life introduced an amended return claiming certain deductions which it had not taken on its original return. Included among these was a deduction for the Ginnie Maes. Ward Life's claim for the deduction was denied because the Ginnie Maes were not found to be obligations of the United States.

Pursuant to the Administrative Review Act (Ill. Rev. Stat. 1977, ch. 110, pars. 264 through 279), Ward Life brought the instant action alleging the foregoing facts. Following briefing and argument, the trial court determined that the Ginnie Maes were not exempt from the tax and entered judgment for the Department. Ward Life brought this appeal.

---

[1] *Ad valorem* personal property taxes have been held to be invalid after January 1, 1979. *Client Follow-Up Co. v. Hynes* (1979), 75 Ill. 2d 208, 390 N.E.2d 847.

OPINION

## I.

In order to understand the nature and purpose of the securities involved in this appeal, a brief digression into their background and content is necessary. In 1968, Congress, in an effort to attract private capital into the secondary mortgage market of private housing, created GNMA as a wholly owned government corporation (see 12 U.S.C. §1716(b)(1976)) and authorized it to implement what has become known as the Mortgage Backed Securities Program. (12 U.S.C. §1721(g)(1976).) A "secondary market" is, in general, the means whereby initial mortgage lenders, such as banks and savings and loan associations, can refinance mortgages that have already been written, thereby freeing their capital to make more mortgage loans. Specifically, GNMA and its counterpart, the Federal National Mortgage Association (FNMA) are to assist this secondary market "by providing a degree of liquidity for mortgage investments, thereby improving the distribution of investment capital available for home mortgage financing." (12 U.S.C. §1716(a)(1976).) New types of securities were authorized; Fannie Maes issued by FNMA under 12 U.S.C. §1719(d)(1976), mortgage participation certificates issued by GNMA under 12 U.S.C. §1717(c)(1976), and Ginnie Maes issued by GNMA under 12 U.S.C. §1721(g)(1976). The instant appeal involves the latter type of certificates.

The basic operation of the program was described in *New York Guardian Mortgagee Corp. v. Cleland* (S.D.N.Y. 1979), 473 F. Supp. 409 and 422, as follows:

> "A financial institution or mortgage servicing company wishing to participate must assemble or acquire a pool of government insured or guaranteed mortgages. GNMA then enters into a standard form 'Guaranty Agreement' with the issuer * * *, under which, *inter alia*, GNMA agrees to guarantee timely payments of principal and interest as required by the terms of the securities [citation], and the issuer agrees to remit in a timely manner all payments required by the terms of the securities. [Citation.] Should the issuer fail to make timely payments as required, the security holder's sole recourse is against GNMA. [Citation.] However, GNMA may treat the issuer's failure to make required payments as an event of default under the Guaranty Agreement [citation], and this provides GNMA with the option of extinguishing the issuer's interest in the pooled mortgages and becoming owner of those mortgages 'subject only to the unsatisfied rights of the holders of the securities * * *.' " *Cleland*, at 411.

> "The statute authorizing the program provides for issuance of securities 'based on and backed by' specified guaranteed mort-

gages in a 'trust or pool.' 12 U.S.C. §1721(g). The issuer, at the time the pool is created, assigns all its rights in the underlying mortgages (including its rights to all interest, principal, and other payments made on or with respect to such mortgages') to GNMA '[t]o provide a base and to back all securities issued * * *.' [Citation.] The authority of the issuer to 'file, process and receive the proceeds from * * * guaranty claims' is specifically made subject to this assignment. [Citation.] * * * A 'custodial account' is established, into which the issuer deposits proceeds from the pooled mortgages and from which withdrawals may generally be made only for payments to security holders. * * * Segregation of the cash flow from mortgages in the pool from the other assets of an issuer is strictly required. [Citation.] The issuer is paid a fee for its services in administering the pool based on and payable from the interest portion of each monthly installment. [Citation.] * * * The Guaranty Agreement insures that the issuer retains only bare legal title sufficient to enable it to service the mortgages." *Cleland*, at 428-29.

GNMA is authorized to collect a reasonable fee from the issuer of the Ginnie Mae for the guaranty and for the analysis of the mortgage pool. 12 U.S.C. §1721(g) (1976).

The Ginnie Mae certificates contain a promise by the issuer (here a California bank) to pay a sum certain with interest in monthly installments to the holder (in this case Ward Life) until payment of all amounts due under the certificate and provide that the holder is the owner of an undivided beneficial interest in a certain proportion of the mortgage pool. The certificate also contains the following language:

"EXCEPT AS HEREINAFTER UNDERTAKEN, THIS CERTIFICATE DOES NOT CONSTITUTE A LIABILITY OF NOR EVIDENCE ANY RECOURSE AGAINST THE ISSUER, SINCE IT IS BASED ON AND BACKED BY THE AGGREGATE DEBT OF THE MORTGAGES INSURED OR GUARANTEED UNDER THE LAWS OF THE UNITED STATES, AS SET FORTH ABOVE, AND SINCE RECOURSE MAY BE HAD TO THE GOVERNMENT NATIONAL MORTGAGE ASSOCIATION IN THE EVENT OF ANY FAILURE OF TIMELY PAYMENT, AS PROVIDED FOR IN THE GUARANTY APPENDED HERETO. IT IS CERTIFIED THAT THIS CERTIFICATE IS LEGAL AND REGULAR IN ALL RESPECTS, AND IS DULY AND VALIDLY ISSUED PURSUANT TO TITLE III OF THE NATIONAL HOUSING ACT, AND THAT NO RULE, REGULATION, OR OTHER LIKE ISSUANCE, AND NO CONTRACT OR OTHER

AGREEMENT OF EITHER THE GOVERNMENT NATIONAL MORTGAGE ASSOCIATION OR THE ISSUER, OR OF BOTH, ADVERSELY AFFECTS THE RIGHTS AND POSITION OF THE HOLDER AS SET FORTH IN THIS CERTIFICATE."

The issuer's name follows this language and then the following guaranty on behalf of GNMA appears:

"GUARANTY: THE UNDERSIGNED, PURSUANT TO SECTION 306(G) OF THE NATIONAL HOUSING ACT, HEREBY GUARANTEES THE TIMELY PAYMENT OF THE PRINCIPAL AND INTEREST SET FORTH IN THE ABOVE INSTRUMENT, SUBJECT ONLY TO THE TERMS AND CONDITIONS THEREOF. THE FULL FAITH AND CREDIT OF THE UNITED STATES IS PLEDGED TO THE PAYMENT OF ALL AMOUNTS WHICH MAY BE REQUIRED TO BE PAID UNDER THIS GUARANTY."

Under the rule first enunciated in *M'Culloch v. Maryland* (1819), 17 U.S. (4 Wheat.) 316, 4 L. Ed. 579, all properties, functions and instrumentalities of the Federal government are immune from State and local taxation. (See *Smith v. Davis* (1944), 323 U.S. 111, 113, 89 L. Ed. 107, 110, 65 S. Ct. 157, 158-59.) To make this implied constitutional immunity explicit, Congress has provided for the exemption from State and local taxes for certain written obligations in 31 U.S.C. §742 (1976). That section provides:

"Except as otherwise provided by law, all stocks, bonds, Treasury notes, and other obligations of the United States, shall be exempt from taxation by or under State or municipal or local authority. This exemption extends to every form of taxation that would require that either the obligations or the interest thereon, or both, be considered, directly or indirectly, in the computation of the tax, except nondiscriminatory franchise or other nonproperty taxes in lieu thereof imposed on corporations and except estate taxes or inheritance taxes."

The basis of this statutory exemption is "the fact that a tax upon the obligations of the United States is virtually a tax upon the credit of the Government, and upon its power to raise money for the purpose of carrying on its civil and military operations." *Hibernia Savings & Loan Society v. City and County of San Francisco* (1906), 200 U.S. 310, 313, 50 L. Ed. 495, 496, 26 S. Ct. 265, 266.

The question raised by this appeal is whether Ginnie Mae certificates issued under 12 U.S.C. §1721(g)(1976), guaranteed by GNMA, and backed by the full faith and credit of the United States, are constitutionally immune from the Illinois Capital Stock Tax or constitute "other obli-

gations of the United States" and are therefore exempt from State taxation under 31 U.S.C. §742 (1976). We find that they are not exempt for either reason and that the deduction for the Ginnie Maes was properly denied.

The credit instrumentalities of the United States recognized by the Supreme Court as constitutionally exempt from State and local taxation have been characterized by "(1) written documents, (2) the bearing of interest, (3) a binding promise by the United States to pay specified sums at specified dates and (4) specific Congressional authorization, which also pledged the faith and credit of the United States in support of the promise to pay." (*Smith v. Davis* (1944), 323 U.S. 111, 114-15, 89 L. Ed. 107, 110, 65 S. Ct. 157, 159.) Such credit instrumentalities are issued in the exercise of the power of Congress to borrow money on the credit of the United States to finance an essential governmental function.

The Ginnie Mae certificates satisfy all of the above requirements except for "a binding promise by the United States to pay specified sums at specified dates." The trial court found that although the guaranty contained in the certificates constitutes an obligation of the United States, it is a contingent and speculative obligation requiring default by the issuer before it arises. Because of the probability that the triggering event would never occur, the trial court apparently found that the Ginnie Maes were not constitutionally immune from a State tax. We agree that the guaranty of the United States to pay the certificates upon default by the issuer is not a binding promise so as to make the Ginnie Mae certificates constitutionally immune from tax. In addition, we find that the Ginnie Maes were not issued by a government agency to borrow money on the credit of the United States to finance an essential governmental function but were guaranteed by GNMA to facilitate their marketability and encourage investment in them by private parties. Because the question of whether the Ginnie Maes are constitutionally immune from tax or are exempted by 31 U.S.C. §742 (1976) depends on the nature of the government's undertaking in the certificates themselves, both questions will be considered together.

■■ As already noted, to be constitutionally immune from tax, credit instrumentalities of the United States must constitute a binding promise to pay specified sums at specified times. 31 U.S.C. §742 (1976) expressly applies to written interest-bearing obligations such as "stocks, bonds, and Treasury notes" issued pursuant to Congressional authorization. Under the rule of *ejusdem generis*, the words "other obligations" in 31 U.S.C. §742 (1976) refer only to obligations of the same type as specifically enumerated. (*Smith v. Davis* (1944), 323 U.S. 111, 117, 89 L. Ed. 107, 112, 65 S. Ct. 157, 160.) In *Smith*, the Supreme Court found this construction to be consistent with the Congressional intent to prevent taxes which diminish in the slightest degree the market value or investment attractiveness of

obligations issued by the United States to secure credit to carry on the necessary functions of government.

The crux of this case is whether the guaranty of payment by GNMA constitutes an obligation of the same nature as the items specifically exempted in 31 U.S.C. §742 (1976). Stocks, bonds, and Treasury notes issued by the United States usually contain language which indicates that a debt or obligation has been incurred by it alone.

The Ginnie Maes in question indicate that the private issuer is primarily liable to make the monthly interest payments and ultimately repay the principal. They do not become an immediate obligation of GNMA until the issuer defaults on them. In that event the pool of mortgages immediately becomes the property of GNMA. Therefore, payment by GNMA is contingent and wholly speculative.

Another difference between the Ginnie Maes and other obligations exempted by 31 U.S.C. §742 (1976) is the fact that Ginnie Maes are issued by a private issuer and not the government and are not used to secure credit for the government. Ward Life notes that prior to 1968 the Federal government through FNMA conducted secondary mortgage operations by actually purchasing mortgages. (See S. Rep. No. 1286, 81st Cong., 2d Sess. (1950), reprinted in [1950], U.S. Code. Cong. & Ad. News, 2021, 2041.) Because periods of tight money and Federal budgetary pressure interrupted the system, Ginnie Maes were created to insulate the secondary market from these pressures without otherwise affecting the market operations. Ward Life contends that because the Ginnie Maes replaced direct use of Treasury funds with private funds, their purpose must be seen as securing credit for a governmental purpose. On the contrary, it appears that the one purpose of GNMA was to attract private capital so that government credit would not be necessary. 12 U.S.C. §1721(b) (1976) expressly states that:

> "For the purposes of this section and to assure that, to the maximum extent, and as rapidly as possible, private financing will be substituted for Treasury borrowings otherwise required to carry mortgages held under the aforesaid separate accountability, * * * [GNMA] is authorized to issue * * * obligations * * *."

Rather than being an obligation issued to secure money for a governmental purpose, Ginnie Maes were created to free government funds from the mortgage market.

In addition, the Ginnie Maes are not issued by the government but by private banks. Ward Life contends that under the guaranty arrangement between the issuer and GNMA, the issuer simply acts as an agent to perform ministerial acts which GNMA could perform directly as it does for mortgage participation certificates issued under 12 U.S.C. §1717(c) (1976) which are immune from taxation. (See 42 Att'y Gen. Op. 323

(1966).) Ward Life contends that the ministerial-type duties performed by the issuer should not cause the instant securities to be treated differently than the Mortgage Participation Certificates. A review of the issuer's duties found in *New York Guardian Mortgagee Corp. v. Cleland* (S.D.N.Y. 1979), 473 F. Supp. 409 and 422, demonstrates that the issuer performs more than ministerial acts for the government and is actually primarily liable on the Ginnie Mae. The issuer deposits proceeds from the pooled mortgages in a custodial account and withdraws proceeds to pay security holders. The issuer is required to make the payments required by the securities and must proceed with due diligence in collecting the proceeds from the pool. The issuer of "modified pass-through" securities (of which the specimen appended to Ward's brief shows the instant securities to be) must make the scheduled payments "whether or not collected" from the mortgage pool. When amounts equal to scheduled payments are not collected, the issuer has a duty to advance from its own funds amounts equal to the payments which should have been collected. Upon default of a mortgage, the issuer is required to act with due diligence in pursuing recovery from the mortgagor, the property, or any insuring agency and must advance his own funds while doing so. If delinquent payments are not forthcoming, the loss initially falls on the issuer. The issuer is not personally liable to holders on GNMA for payments due but not collected provided it diligently performs its duties as issuer. Only upon default in payment by the issuer is the legal title in the mortgage pool transferred to GNMA. These duties show that a private issuer is primarily liable to make the monthly payments and does not act merely as an agent of the government. The private issuer does not only channel money to GNMA but actively manages and controls the pool of mortgages backing the securities. The provision for private issuers of Ginnie Maes suggests that Congress desired to make the secondary mortgage market capable of being privately managed and getting GNMA out of the secondary market.

Since a third party is actually primarily liable to pay the holder and the obligation embodied in GNMA's guaranty is therefore indirect and speculative, the Ginnie Maes do not contain a direct and immediate promise to pay of the same nature as the "other obligations" contemplated by Congress in 31 U.S.C. §742 (1976). In this regard the Ginnie Maes issued in the instant case under 12 U.S.C. §1721(g) (1976) differ from Mortgage Participation Certificates issued under 12 U.S.C. §1717(c) (1976) and the Fannie Maes issued under 12 U.S.C. §1719(d) (1976). Under the latter two sections FNMA and GNMA issue the certificates and are directly liable for payment. By contrast, the instant guarantee of payment is truly an indirect and contingent obligation of the United States and does not exempt the Ginnie Maes from State taxation.

*S.S. Silberblatt, Inc. v. Tax Com.* (1959), 5 N.Y.2d 635, 186 N.Y.S.2d 646, 159 N.E.2d 195, involved a similar question. In order to facilitate the construction of a military housing project, the Federal Housing Administration insured the mortgages of appellant, a private contracting firm, and guaranteed the periodic payment of $90 per family unit. When the mortgages were presented for recording, the county clerk demanded a mortgage recording tax. The appellant challenged the validity of the tax, contending that it was improperly imposed upon obligations of the United States and its instrumentalities used in carrying out its functions. Specifically, the appellant asserted that the mortgages constituted direct obligations of the United States and as such were immune from State taxation under 31 U.S.C. §742 (1976). In rejecting this claim the court noted:

"Under the arrangement authorized by the Enabling Act, it is clear that the device employed was designed to relieve the Government of its financially burdensome obligation to provide housing for its military personnel and at the same time avoid increasing the national debt. It did not pledge its credit in the usual sense, but merely guaranteed each 'periodic payment' based on a monthly average of $90 per family unit." 5 N.Y.2d 635, 641, 186 N.Y.S.2d 646, 650, 159 N.E.2d 197-98.

Ward Life attempts to distinguish the *Silberblatt* case from this case by arguing that the promissory notes issued by the contractor to borrow the money presumably carried the usual rights of recourse against the contractor and was an ordinary commercial transaction without a pledge of the government's full faith and credit and therefore could be found not to be a pledge of credit "in the usual sense." Although the nature of the lender's rights of recourse against the contractor does not appear in that opinion, it is clear from an examination of the nature of the issuer's duties to the holder that the primary duty to pay falls on the issuer and that a holder's lack of recourse against an issuer upon default should not change the contingent nature of the government's obligation. ·

An older case which would support this same conclusion is *Board of Commissioners v. Elston* (1869), 32 Ind. 27. At issue was whether Treasury notes known as "greenbacks" and notes from national banks were exempt from State taxation by the predecessor of 31 U.S.C. §742 (1976). The court held the Treasury notes to be exempt since they were a means to borrow money on the promise of the government to redeem them in gold and their value depended directly on the government's credit. On the other hand, the court held the national bank currency to be nonexempt from taxation reasoning as follows:

"Clearly, no exemption in any act prior to the authority given to issue 'national currency' can apply, and as they are not obligations

of the United States, in any proper sense of that expression, as they do not rest primarily on the promise of the government to pay them as her own debt, but simply on her promise that she will amply indemnify herself in her own bonds, and only after failure of the bank and forfeiture of the bonds to her will she regard herself as finally liable; certainly, there is nothing in the letter of the law exempting this circulation from taxation; and though we do not discuss the power of Congress to make such exemption, we are free to admit that we see nothing in the paper itself or the circumstances of its issue which would authorize such a limit to be placed on the power of the state to tax." 32 Ind. 27, 33-34.

Both *Silberblatt* and *Elston* are authority supporting the view that a guarantee of payment as opposed to a direct promise to pay does not involve a pledge of the government's credit in the usual sense or an obligation of the nature intended to be exempted from State tax.

Ward Life also contends that even if the Ginnie Maes are not primarily government obligations, they are still exempt from tax since "31 U.S.C. §742 forbids any state tax on *any* 'obligation of the United States.'" There is no doubt that the certificates constitute some obligation of the United States; however, in construing 31 U.S.C. §742 (1976), the Supreme Court has stated that under the rule of *ejusdem generis* the words "other obligations" refer "only to obligations or securities of the same type as those specifically enumerated." (*Smith v. Davis* (1944), 323 U.S. 111, 117, 89 L. Ed. 107, 112, 65 S. Ct. 157, 160.) As the trial court noted the Ginnie Maes are not like "stocks, bonds and Treasury notes" issued by the Federal government where an immediate and direct debt is incurred by the United States and which it alone makes a binding promise to pay.

■■ For the foregoing reasons, we find that the Ginnie Maes involved here are not constitutionally immune from State tax nor are they "obligations of the United States" within the meaning of 31 U.S.C. § 742 (1976) so as to be exempt. Therefore, their deduction was properly denied.

## II.

Ward Life contends that even if the Ginnie Maes are not Federal obligations exempt from State taxation, the Department is precluded from retroactively withdrawing the exemption which it has recognized in its Illinois Property Tax Manual (reprinted in [1979] State and Local Taxes-Illinois (P-H) §32,500 through 32,586) and upon which the investment community has relied.

The Property Tax Manual provides:

"* * * The following are the general classes of federal securities which are not subject to assessment under the property tax.

(a) Direct obligations of the United States such as: U.S. Treasury Bonds, U.S. Treasury Bills and Notes, Postal Savings Bonds, United States Savings Bonds (Series A through K), Certificates of Indebtedness, Panama Canal Loan of 1961.

(b) Obligations guaranteed by the United States as to principal and interest such as: Commodity Credit Corporation, Federal Farm Mortgage Corporation Bonds, Federal Housing Administrative Debentures, Tennessee Valley Authority Bonds.

(c) Obligations of other Federal agencies such as: Federal Home Loan Bank bonds or debentures, Federal Land Bank bonds, Joint Stock Land Bank Bonds."

■■ As already discussed, the Ginnie Mae certificates are not direct obligations of the United States and although not specifically listed in the Manual, they would appear to be included within subsection (b) as an obligation guaranteed as to principal and income. However, the fact that the Department erroneously included certain nonexempt property as exempt would not preclude a subsequent correction of the error and taxation of the property. We reach this conclusion after considering the following factors. "Taxation is the rule—tax exemption is the exception." (*Rogers Park Post No. 108 v. Brenza* (1956), 8 Ill. 2d 286, 290, 134 N.E.2d 292, 295.) Every presumption is against the intention of the State to exempt property from taxation. (*Reeser v. Koons* (1966), 34 Ill. 2d 29, 36, 213 N.E.2d 561, 565.) Provisions granting tax exemptions are strictly construed and must be within the terms of the statute and any applicable constitutional authority. (*Brenza*, at 295.) An administrative agency, such as the Department, has the power to issue only such rules and regulations as are authorized by statute and as are in accord with the policies of the statute (see *Fahey v. Cook County Police Department Merit Board* (1974), 21 Ill. App. 3d 579, 583, 315 N.E.2d 573, 576) and cannot extend the operation of a statute by regulation. (*Illinois Bell Telephone Co. v. Illinois Commerce Com.* (1953), 414 Ill. 275, 279, 111 N.E.2d 329, 332.) To the extent that a rule conflicts with a statute, the rule is invalid. (*Pye v. Marco* (1973), 13 Ill. App. 3d 923, 926, 301 N.E.2d 63; *Billik v. Village of Brookfield* (1980), 80 Ill. App. 3d 907, 910, 400 N.E.2d 702, 705.) Finally, the agency's exercise of its authority is subject to judicial review concerning its propriety. *People ex rel. Petersen v. Turner Co.* (1976), 37 Ill. App. 3d 450, 462, 346 N.E.2d 102, 112; *Brown v. Sexner* (1980), 85 Ill. App. 3d 139, 152, 405 N.E.2d 1082, 1092.

■■ Section 19.4 of the Revenue Act of 1939 (Ill. Rev. Stat. 1977, ch. 120, par. 500.4) exempts "Property of the United States, except such property as the United States has permitted or may permit to be taxed." Obligations of the United States such as Federal securities and instrumentalities of the Federal government were found to be exempt from the predeces-

sor of the current capital stock tax. (*Price Flavoring Extract Co. v. Lindheimer* (1938), 368 Ill. 450, 14 N.E.2d 476.) The legislature exempted only property of the United States and the Department would be authorized in makings its regulations to exempt only those items which truly were the property or an obligation of the United States. The Department has recognized this in the Tax Manual, which specifically provides:

> "The only exemptions to the general property tax in Illinois are those required by the United States Constitution and those authorized by the Illinois constitution and granted by statutes enacted by the General Assembly."

To the extent that the regulations of the Department have exempted items which are not truly obligations of the United States, it has exceeded its statutory authorization and the regulation is invalid. A construction of the Property Tax Manual which exempts the Ginnie Maes would render the regulation invalid since they are not the type of property which the legislature intended to exempt. This court may properly find that inclusion of the Ginnie Maes as exempt property is improper and that the Department is therefore not precluded from taxing them.

Ward Life cites *People v. Illinois Central R.R. Co.* (1916), 273 Ill. 220, 112 N.E. 700; *Peoples Gas Light & Coke Co. v. Stuckart* (1918), 286 Ill. 164, 121 N.E. 629; *People ex rel. Little v. St. Louis Electric Bridge Co.* (1919), 290 Ill. 307, 125 N.E. 280; *Margolin v. Public Mutual Fire Insurance Co.* (1972), 4 Ill. App. 3d 661, 281 N.E.2d 728, and several other cases as support for the proposition that the department is bound by the provisions in the Tax Manual and cannot change them now. Those were cases in which an agency either ignored valid rules which were within the statutory authority of the agency or applied them in an arbitrary or discriminatory fashion in assessing property. Because a regulation exempting the Ginnie Maes would be invalid, the Department would not be bound to follow it as it would be were it valid. We therefore find the cited cases to be inapposite.

For the foregoing reasons, the judgment of the trial court is affirmed.

Affirmed.

SULLIVAN, P. J., and WILSON, J., concur.