ROCKFORD LIFE INSURANCE COMPANY, Plaintiff-Appellant, v. THE DEPARTMENT OF REVENUE *et al.*, Defendants-Appellees.—THE PEOPLE *ex rel.* DOUGLAS R. AURAND, Treasurer and Ex-Officio County Collector of Winnebago County, Plaintiff-Appellee, v. ROCKFORD LIFE INSURANCE COMPANY, Defendant-Appellant.

Second District   Nos. 83—626, 83—627 cons.

Opinion filed October 26, 1984.

Russell D. Anderson and John C. McCarthy, both of Williams & McCarthy, of Rockford, for appellant.

Neil F. Hartigan, Attorney General, of Springfield (Patricia Rosen, Frederic D. Tannenbaum, and Georgene M. Wilson, Assistant Attorneys General, of counsel), for appellees Department of Revenue and James B. Zagel.

Daniel D. Doyle, State's Attorney, of Rockford (James J. Reese, Assistant State's Attorney, of counsel), for other appellee.

JUSTICE LINDBERG delivered the opinion of the court:

Plaintiff Rockford Life Insurance Company (Rockford) appeals from an order of the circuit court of Winnebago County affirming the 1978 assessment of its capital stock by defendant-appellee, Department of Revenue (Department). Rockford also appeals from the order in the case consolidated with the instant appeal entering judgment against Rockford in the amount of $723,053.70 and costs. Rockford argues that certain of its securities (mortgage-backed securities of the Government National Mortgage Association (GNMA), and obligations issued pursuant to the New Communities Act (NCA), the New Community Development Act (NCDA), and the Merchant Marine Act (MMA)) improperly were included in the capital stock assessment because they are direct obligations of the United States immune from State taxation. Because we conclude the obligations at issue are not direct obligations issued by the Federal government, we affirm.

On December 21, 1978, the Illinois Department of Local Government Affairs assessed the capital stock of Rockford for the year 1978 at a value of $6,937,000. Review of the assessment was requested by Rockford, and on May 2, 1979, the Illinois Department of Local Government Affairs, by letter, confirmed the assessment. Rockford thereupon filed a complaint in the circuit court of Winnebago County, Illinois, pursuant to the Administrative Review Act (Ill. Rev. Stat. 1979, ch. 110, par. 264 *et seq.*). Following hearings on motions, the court or-

dered that the case be remanded to the Department of Local Government Affairs with instructions to formally notify Rockford of its decision in accordance with its rules. On October 29, 1979, the Department of Local Government Affairs served notice of its decision confirming the assessment. Pursuant to Rockford's request, the Department of Revenue (as successor to the Department of Local Government Affairs) held a hearing on December 21, 1979. Following the hearing, the Director of the Department affirmed the assessment.

The company thereafter filed its complaint seeking judicial review of the decision of the Department affirming the 1978 assessment, and the Department filed the administrative record as its answer to the complaint. In the trial court, Rockford argued that: (1) since the three types of securities were exempt as U.S. obligations under the Constitution and statutes of the United States, their value could not be included in computing the capital stock assessment; and (2) the Department was estopped because of its exclusion of the securities in 1974 through 1978 from including these securities in the 1978 capital stock assessment. In a memorandum decision, the trial court affirmed the Department's ruling and entered the following findings: (1) the securities in question were not "obligations of the United States" under 31 U.S.C. sec. 742 (1976) and therefore were not constitutionally immune from State taxation; (2) the Department's erroneous inclusion of nonexempt property as exempt property in its property tax manual did not preclude subsequent correction of the error and taxation of the property; and (3) the necessary fraud or injustice required for the application of the doctrine of estoppel was not demonstrated by the erroneous ruling of the Department or its failure to assess taxable property in prior years. Rockford filed a timely appeal from the trial court order entered on June 10, 1983, affirming the Department assessment. This appeal solely concerns the capital stock assessment against Rockford for 1978 because the capital stock tax was abolished on January 1, 1979, by article IX, section 5, of the Constitution of Illinois of 1970 (Ill. Const. 1970, art. IX, sec. 5).

Rockford asserts that the Department is estopped from assessing the securities in question because of its previous administrative determinations that the securities were exempt from state taxation. The doctrine of equitable estoppel is "the effect of the voluntary conduct of a party whereby he is precluded from asserting rights which might otherwise have existed as against another party who has relied in good faith upon such conduct and has been led thereby to change his position for the worse." (*Tyska v. Board of Education* (1983), 117 Ill. App. 3d 917, 930, 453 N.E.2d 1344, 1355; *Kyker v. Kyker* (1983), 117

Ill. App. 3d 547, 453 N.E.2d 108.) The party claiming the estoppel must have relied upon the acts or representations of the other and have had no knowledge or convenient means of knowing the true facts. *Hickey v. Illinois Central R.R. Co.* (1966), 35 Ill. 2d 427, 447, *cert. denied* (1967), 386 U.S. 934, 17 L. Ed. 2d 806, 87 S. Ct. 957.

The doctrine of estoppel can be applied against the State when acting in a governmental capacity only in the most compelling circumstances. (*Hickey v. Illinois Central R.R. Co.* (1966), 35 Ill. 2d 427, *cert. denied* (1967), 386 U.S. 934, 17 L. Ed. 2d 806, 87 S. Ct. 957; *Tyska v. Board of Education* (1983), 117 Ill. App. 3d 917, 453 N.E.2d 1344; see generally Annot., 21 A.L.R. 4th 573 (1983).) "[W]here public revenues are involved, public policy ordinarily forbids the application of estoppel to the State" and " '[t]he government is not estopped by previous acts or conduct of its agents with reference to the determination of tax liabilities or by failure to collect the tax, nor will the mistakes or misinformation of its officers estop it from collecting the tax.' " *Austin Liquor Mart, Inc. v. Department of Revenue* (1972), 51 Ill. 2d 1, 4-5.

While acknowledging the principle that a State will generally not be estopped from collecting a tax, Rockford argues this case presents extraordinary circumstances justifying application of the estoppel doctrine and relies upon *Hickey v. Illinois Central R.R. Co.* (1966), 35 Ill. 2d 427, *cert. denied* (1967), 386 U.S. 934, 17 L. Ed. 2d 806, 87 S. Ct. 957, for support. In *Hickey*, a railroad maintained and improved large amounts of lakefront property for over 50 years. Refusing to recognize "a right in the State officially disclaimed [by the State] for half a century" (35 Ill. 2d 427, 449), the supreme court held the State should be estopped from now asserting its interest in the subject property. The court in *Hickey* emphasized the railroad's reliance on the State's position:

> "Meanwhile, numerous other lake shore boundary line agreements have been consummated and confirmed, conveyances made, leases executed and options granted; proposals for lake shore development were agreed upon and accepted whereby substantial construction obligations were apportioned as between the city, Park Commissioners and the railroad in reliance upon the assumption that the railroad was the fee owner of the lands it occupied ***." (35 Ill. 2d 427, 450.)

Therefore, while the *Hickey* court reiterated that qualified immunity from the estoppel doctrine was enjoyed by the State, it held that under these "extraordinary circumstances," the State was estopped from asserting its latent title claim.

Rockford argues the circumstances here similarly are "extraordinary." In the case at bar, Rockford reported NCA obligations on its 1974 tax return which were initially assessed but were later ruled exempt by the Director. In 1975, Rockford reported NCA and GNMA obligations which were initially assessed, but were later deducted from its capital stock assessment. Rockford in its 1976 return reported MMA obligations in addition to the GNMA obligations which the Director initially assessed, but upon reconsideration exempted from the capital stock tax computation. In its 1977 return, Rockford reported additional GNMA and MMA obligations as deductions which the Department allowed. In 1978, the Department reversed its prior position and decided that the GNMA, MMA, NCA and NCDA obligations were subject to the capital stock tax.

Rockford argues that these circumstances constitute appropriate grounds for estoppel and contends all of the elements of the doctrine are satisfied: (1) positive acts by the Department; (2) justifiable reliance by Rockford upon these acts; (3) amounting to fraud and injustice. Rockford cites the regulations contained in the Department's manual and the approval of the exemption in the years 1974-77 as positive acts by the State. The Department counters that its exemptions of these securities at issue are less affirmative than were the actions of the State in *Austin Liquor Mart, Inc. v. Department of Revenue* (1972), 51 Ill. 2d 1, where the Department accepted payment from the taxpayer of his assessment and then attempted to reopen the investigation concerning the period covered by the assessment. The Department also quotes supreme court language that "State inspectors perform[ing] the ministerial acts of computing the tax due under one particular formula does not estop the State from repudiating that formula." (*People ex rel. Scott v. Chicago Thoroughbred Enterprises, Inc.* (1973), 56 Ill. 2d 210, 220.) Nevertheless, we conclude the approval of the exemption constitutes a positive act of the State.

■ Rockford also asserts it relied upon the exemption, planning its investment strategy on the assumption that the obligations would continue to be excluded from calculation of the capital stock tax. Rockford's additional purchases of the subject obligations in the years 1974 through 1977 arguably provide some evidence of reliance by Rockford on the acts of the Department. However, Rockford's reliance was not reasonable. The taxable nature of these securities was unclear during at least three of the four subject years. No court decision or legislative pronouncement had resolved the issue, and therefore, Rockford's reliance on the inconsistent Department rulings was unjustified. This is especially true because, unlike the 50-year time

period in *Hickey,* here the Department had only exempted the obligations for four years prior to its decision to include them in the tax calculation. The Department also raises a persuasive public policy argument, stating that were this court to apply the estoppel doctrine on the basis of four years of inconsistent Department actions, an administrative agency considering a novel issue would be bound by its initial ruling and would be precluded from adopting a new policy or from correcting an erroneous construction of the applicable law.

While the absence of reasonable reliance is alone fatal to Rockford's estoppel claim, Rockford has also failed to establish fraud. Rockford's allegations of fraud are unpersuasive. Rockford cites the fact that the Department's policy change resulted in almost a $500,000 tax liability, but the magnitude of the tax does not establish the existence or absence of fraud. Additionally, Rockford states that the Department's delay in assessing the tax until the last year of the capital stock tax "raises the inference of a calculated plan to catch this taxpayer offguard." This allegation, however, is unsupported. Any allegation that the Department was negligent also does not amount to fraud.

> "More importantly, perhaps, is the possibility that application of *laches* or estoppel doctrines may impair the functioning of the State in the discharge of its government functions, and that valuable public interests may be jeopardized or lost by the negligence, mistakes or inattention of public officials." (*Hickey v. Illinois Central R.R. Co.* (1966), 35 Ill. 2d 427, 447-48, *cert. denied* (1967), 386 U.S. 934, 17 L. Ed. 2d 806, 87 S. Ct. 957.)

In the absence of any proof that the Department's action constituted a fraud resulting in an injustice done to Rockford, the State should not be estopped from including the subject obligations in Rockford's capital stock tax calculation for 1978.

Rockford next contends that the debt obligations here were improperly included in the capital assessment because they constitute property of the United States immune from State taxation.

### A. GNMA OBLIGATIONS

GNMA is a government-sponsored private corporation which was created in 1968 out of and partitioned from the Federal National Mortgage Association (FNMA). Both FNMA and GNMA are authorized to "purchase, service, sell, or otherwise deal in any mortgages which are insured or guaranteed under [a variety of Federal statutes]." (12 U.S.C. sec. 1717(b)(1) (1976).) GNMA's role is to implement the mortgage-backed securities program. GNMA enters into "Guar-

anty Agreements" with private investors who assemble pools of mortgages and issue them for public offering. The issuer retains title to the pool, but assigns its rights in the underlying mortgages to GNMA. *New York Guardian Mortgagee Corp. v. Cleland* (S.D.N.Y. 1979), 473 F. Supp. 409, 411 n. 2.

The assignment remains unrecorded "unless the issuer defaults on payments to security holders and GNMA exercises its option to assume issuer responsibilities." (*New York Guardian Mortgagee Corp. v. Cleland* (S.D.N.Y. 1979), 473 F. Supp. 422, 428.) GNMA's guarantee of the issuer's mortgage pools, however, "will not bring about an increase in the government's total contingent liability *** GNMA is authorized to collect a fee for its guarantee, and it is intended that this program will be fully self-supporting and will operate at no cost to the Government." 114 Cong. Rec. 15, 236 (1968) (remarks of Sen. Bennett).

The full faith and credit of the United States is pledged to the payment of all amounts which may be required to be paid under the guarantee. (12 U.S.C. sec. 1721(g) (1976).) The purpose of FNMA and GNMA is "to provide supplementary assistance to the secondary market for home mortgages by providing a degree of liquidity for mortgage investments, thereby improving the distribution of investment capital available for home mortgage financing ***." 12 U.S.C. sec. 1716(a) (1976).

### B. NCA AND NCDA OBLIGATIONS

The New Communities Act of 1968 (42 U.S.C. sec. 3901 *et seq.* (1976)) and the Urban Growth and New Community Development Act of 1970 (42 U.S.C. sec. 4501 *et seq.* (1976)) attempt to "facilitat[e] the enlistment of private capital in new community development" (42 U.S.C. sec. 3901 (1976)), and to provide for the development of a national urban growth policy and to encourage the "rational, orderly, efficient, and economic growth, development, and redevelopment of our States, metropolitan areas, cities, counties, towns, and communities ***." (42 U.S.C. sec. 4501 (1976).) These Acts authorize the Secretary of Housing and Urban Development (HUD), in the case of the former Act, and the Secretary acting through the community development corporation, in the case of the latter enactment, to guarantee bonds, debentures, notes or other obligations of eligible new community developers as the means of carrying out their governmental purposes. (See 42 U.S.C. sec. 3902 (1976) and 42 U.S.C. sec. 4514 (1976).) The full faith and credit of the United States is pledged to the guarantee of the payment of such obligations. (42 U.S.C. sec. 3906(b) (1976) and

42 U.S.C. sec. 4514(b) (1976).) In return for the guarantee, the issuer pays to the Secretary a fee. 42 U.S.C. sec. 3905 (1976).

### C. MMA OBLIGATIONS

The Merchant Marine Act of 1936 establishes a Federal Ship Financing Fund "to foster the development and encourage the maintenance of such a merchant marine." (46 U.S.C. sec. 1101 (1976).) To that purpose, the Secretary of Commerce may authorize guarantees of principal and interest on bonds issued by private obligors. (46 U.S.C. sec. 1273(a) (1976).) The Secretary receives from the obligor a security interest, perfected only upon default. (46 U.S.C. sec. 1273(b) (1976).) The program, furthermore, is self-supporting. The obligor pays a fee to the Secretary. (46 U.S.C. sec. 1274(e) (1976).) The full faith and credit of the United States is pledged to the payment of these guarantees under 46 U.S.C. sec. 1273(d) (1976).

These debt securities all have certain characteristics in common: they are issued by private parties, guaranteed by the full faith and credit of the United States government, and the United States government receives the fee for the guarantees. Since of these securities GNMA obligations have the most indicia of tax-exempt status and since the parties almost exclusively discuss GNMA obligations, the following analysis will refer solely to GNMA obligations even though the conclusions reached are equally applicable to MMA, NCA and NCDA obligations.

In support of its contention that the obligations here are tax exempt, Rockford advances constitutional and statutory arguments. The constitutional argument is based upon the doctrine of implied powers recognized in *M'Culloch v. State of Maryland* (1819), 17 U.S. (4 Wheat.) 316, 4 L. Ed. 579. Under the rule first announced in *M'Culloch*, all properties, functions and instrumentalities of the Federal government are immune from State and local taxation. (*Montgomery Ward Life Insurance Co. v. Department of Local Government Affairs* (1980), 89 Ill. App. 3d 292, 411 N.E.2d 973, citing *Smith v. Davis* (1944), 323 U.S. 111, 113, 89 L. Ed. 107, 110, 65 S. Ct. 157, 158-59.) In *M'Culloch*, the Supreme Court struck down on the authority of the supremacy clause a State tax on the national bank which the government had established.

> "The result is a conviction that the states have no power, by taxation or otherwise, to retard, impede, burden, or in any manner control the operations of the constitutional laws enacted by Congress to carry into execution the powers vested in the general government. This is, we think, the unavoidable con-

sequence of that supremacy which the Constitution has declared." (17 U.S. (4 Wheat.) 316, 436, 4 L. Ed. 579, 609.)

The *M'Culloch* court, however, restricted the breadth of its holding:

"This opinion does not deprive the states of any resource which they originally possessed. It does not extend to a tax paid by the real property of the bank, in common with other real property within the state, nor to a tax imposed on the interest which the citizens of Maryland may hold in this institution, in common with other property of the same description throughout the state." 17 U.S. (4 Wheat.) 316, 436, 4 L. Ed. 579, 609.

Congress had codified this constitutional immunity by exempting from State and local taxation certain written obligations. (See 31 U.S.C. sec. 742 (1976), now codified as 31 U.S.C.A. sec. 3124(a) (West Supp. 1983); see *Montgomery Ward Life Insurance Co. v. Department of Local Government Affairs* (1980), 89 Ill. App. 3d 292, 411 N.E.2d 973.) That section provided:

"Except as otherwise provided by law, all stocks, bonds, Treasury notes, and other obligations of the United States, shall be exempt from taxation by or under State or municipal or local authority. This exemption extends to every form of taxation that would require that either the obligations or the interest thereon, or both, be considered, directly or indirectly, in the computation of the tax, except nondiscriminatory franchise or other nonproperty taxes in lieu thereof imposed on corporations and except estate taxes or inheritance taxes." (31 U.S.C. sec. 742 (1976).)

The Supreme Court recently stated that its previous decisions have treated section 742 principally as a restatement of the constitutional rule regarding the immunity of Federal government property including bonds and other securities from taxation by the States. (*Memphis Bank & Trust Co. v. Garner* (1983), 459 U.S. 392, 397, 74 L. Ed. 2d 562, 567, 103 S. Ct. 692, 696.) The basis of the statutory exemption is "the fact that a tax upon the obligations of the United States is virtually a tax upon the credit of the government, and upon its power to raise money for the purpose of carrying on its civil and military operations." (*Hibernia Savings & Loan Society v. San Francisco* (1906), 200 U.S. 310, 313, 50 L. Ed. 495, 496, 26 S. Ct. 265, 266.) Since the question whether the subject obligations are constitutionally immune from taxation or are exempted by 31 U.S.C. sec. 742 (1976) is answered by examining the nature of the government's undertaking in the certificates themselves (*Montgomery Ward Life Insurance Co. v.*

*Department of Local Government Affairs* (1980), 89 Ill. App. 3d 292, 297, 411 N.E.2d 973, 977; see also *Farmers & Traders State Bank v. Johnson* (1984), 121 Ill. App. 3d 43, 45, 458 N.E.2d 1365, 1367), and since section 742 is primarily a restatement of the constitutional rule, both the constitutional and statutory inquiries will be considered together.

The question thus presented, Rockford asserts, is whether the four debt obligations at issue here are constitutionally immune from the Illinois Capital Stock Tax or are "other obligations of the United States" exempt from State taxation under 31 U.S.C. sec. 742 (1976). The Supreme Court in *Smith v. Davis* (1944), 323 U.S. 111, 114-15, 89 L. Ed. 107, 110-11, 65 S. Ct. 157, 159, enumerated certain attributes of exempt obligations:

> "(1) written documents, (2) the bearing of interest, (3) a binding promise by the United States to pay specified sums at specified dates and (4) specific Congressional authorization, which also pledged the faith and credit of the United States in support of the promise to pay."

The court in *Montgomery Ward* applied the *Smith* criteria to GNMA obligations and determined that GNMA certificates "satisfy all of the above requirements except for 'a binding promise by the United States to pay specified sums at specified dates.' " (*Montgomery Ward Life Insurance Co. v. Department of Local Government Affairs* (1980), 89 Ill. App. 3d 292, 297, 411 N.E.2d 973, 976.) While recognizing that the certificates represent some sort of obligation of the United States, the *Montgomery Ward* court employed the *ejusdem generis* rule (rule of construction whereby general terms will be construed to include only things of same general class as those enumerated, Black's Law Dictionary 464 (5th ed. 1979)), and concluded that the term "other obligations" in section 742 did not include GNMA obligations in part because they are privately issued.

Rockford challenges the *Montgomery Ward* court's statement that "Ginnie Maes are issued by a private issuer and not the government ***." (*Montgomery Ward Life Insurance Co. v. Department of Local Government Affairs* (1980), 89 Ill. App. 3d 292, 298, 411 N.E.2d 973, 977.) Review of the GNMA mortgage-backed securities program described by the court in *New York Guardian Mortgagee Corp. v. Cleland* (S.D.N.Y. 1979), 473 F. Supp. 409, 411, however, makes clear that the issuer is a private entity.

> "A financial institution or mortgage servicing company wishing to participate must assemble or acquire a pool of government insured or guaranteed mortgages. GNMA then enters into a

> standard form 'Guaranty Agreement' with the issuer (this Guaranty Agreement is set forth at Appendix 19 to the GNMA Mortgage Backed Securities Guide, GNMA 5500.1 Rev. 4 (hereafter referred to as 'GNMA Guide')), under which, *inter alia*, GNMA agrees to guarantee timely payments of principal and interest as required by the terms of the securities (Guaranty Agreement sec. 6.01), and the issuer agrees to remit in a timely manner all payments required by the terms of the securities. Guaranty Agreement sec. 4.01. Should the issuer fail to make timely payments as required, the security holder's sole recourse is against GNMA (*Id.* sec. 7.01). However, GNMA may treat the issuer's failure to make required payments as an event of default under the Guaranty Agreement (sec. 8.01), and this provides GNMA with the option of extinguishing the issuer's interest in the pooled mortgages and becoming owner of those mortgages 'subject only to the unsatisfied rights of the holders of the securities....' 12 U.S.C. sec. 1721(g) (1976); Guaranty Agreement sec. 8.05."

Additionally, the issuer is named specifically on the GNMA certificate contained in the trial record as the issuer of the security. We therefore are unpersuaded by Rockford's contention that the *Montgomery Ward* court erred in concluding that GNMA certificates are issued by a private issuer.

Rockford also contests the *Montgomery Ward* court's statement that the "private issuer is primarily liable to make the monthly interest payment and ultimately repay the principal." (*Montgomery Ward Life Insurance Co. v. Department of Local Government Affairs* (1980), 89 Ill. App. 3d 292, 298, 411 N.E.2d 973, 977.) Noting that the payments do not become an obligation of GNMA unless and until the issuer defaults, the *Montgomery Ward* court characterized that eventuality as "contingent and wholly speculative." (*Montgomery Ward Life Insurance Co. v. Department of Local Government Affairs* (1980), 89 Ill. App. 3d 292, 298, 411 N.E.2d 973.) Rockford responds that in reality, the government and not the private issuer is primarily responsible because each certificate is signed only by GNMA and because both the GNMA guide and security certificate say GNMA and not the issuer is liable for the guarantee. This statement concerning the guide and certificate is accurate because GNMA and not the issuer *guarantees* the obligation. This fact, however, does not make GNMA primarily liable, as argued by Rockford. Rather, the issuer assumes primary responsibility for payments to the security holders. Also, as the Department points out, *New York Guardian Mortgagee*

*Corp. v. Cleland* (S.D.N.Y. 1979), 473 F. Supp. 409, 411, cited by Rockford, recognized that the assignment to GNMA of the issuer's rights and liabilities only occurs upon the issuer's default.

Rockford's depiction of the issuer as simply an agent of GNMA responsible merely for collecting and distributing funds is belied by the *Cleland* court's description of the issuer's duties concerning section 1721(g) modified pass-through mortgages, which are the subject of this action.

> "Federal regulations establish two types of mortgage backed securities: 'straight pass-through' securities, which provide for the payment by the issuer to the security holders of 'principal and interest [generated by the underlying pool of mortgages] *as collected*' and 'modified pass-through' securities, which 'provide for such payment, *whether or not collected*, of both specified principal installments and a fixed rate of interest on the unpaid principal balance, with all prepayments being passed through to the holder.' 24 CFR sec. 390.5 (1978) (emphasis added)." (*New York Guardian Mortgagee Corp. v. Cleland* (S.D.N.Y. 1979), 473 F. Supp. 409, 411.)

Because the certificates here are modified pass-through securities, the issuer was responsible to make principal and interest payments to Rockford even if it had not yet received payments from the mortgagors. The existence of this obligation supports the *Montgomery Ward* court's conclusion that the issuer and not GNMA is primarily liable for the principal and interest due on the certificates.

Rockford also challenges a finding of the *Montgomery Ward* court that the GNMA obligations "were not issued by a government agency to borrow money on the credit of the United States to finance an essential government function." (*Montgomery Ward Life Insurance Co. v. Department of Local Government Affairs* (1980), 89 Ill. App. 3d 292, 297, 411 N.E.2d 973, 977.) Rockford maintains on the authority of two Supreme Court decisions that the *Montgomery Ward* court erred in distinguishing GNMA obligations on this basis. In *People ex rel. Bank of New York National Banking Association v. Hoffman* (1869), 74 U.S. (7 Wall.) 16, 19 L. Ed. 57, the court concluded that certificates of indebtedness issued by the Federal government to creditors in exchange for supplies were exempt from State taxation. The *Hoffman* court stated:

> "But we fail to perceive *** that such certificates [certificates of indebtedness issued by the Federal government in exchange for goods or services], *issued* as a means of executing constitutional powers of the government other than of borrowing

money, are not as much beyond control and limitation by the States through taxation, as bonds or other obligations issued for loans of money." (Emphasis added.) (74 U.S. (7 Wall.) 16, 24, 19 L. Ed. 57, 60.)

Rockford emphasizes the language that the certificates were issued as a means of executing constitutional powers other than of borrowing money in an effort to discredit the *Montgomery Ward* court's finding that GNMA obligations were not issued by the government to borrow money. However, as the Treasurer points out, the court in *Hoffman* was discussing two types of debt instruments issued directly by the Federal government. The GNMA obligations here were not issued by the Federal government, but rather by private entities.

In the second case cited by Rockford, *Hibernia Savings & Loan Society v. San Francisco* (1906), 200 U.S. 310, 50 L. Ed. 495, 26 S. Ct. 265, the Supreme Court rejected the claim that checks issued in payment of interest accrued upon registered bonds of the United States were entitled to exemption from State taxation. Rockford relies upon *Hibernia* because that court stated that the test for determining exemptions was whether the tax hindered the effective exercise of the government agent's function. The Department counters that the test articulated in *Hibernia* only applies to cases where the United States' obligations are at issue; otherwise, tax exemption would apply to any area in which the Federal government in some manner had acted. We are persuaded by the Department's argument that the scope of the *Hibernia* language is too broad to be useful as a test in the case at bar. Furthermore, even if the test was applicable, the effect of the capital stock tax does not "deprive *** [the private corporations] of power to serve the government as they were intended to serve it ***" (*Hibernia Savings & Loan Society v. San Francisco* (1906), 200 U.S. 310, 315, 50 L. Ed. 495, 497, 26 S. Ct. 265, 267), for Rockford has cited no evidence in the record that issuers have been unable to market these certificates because they are taxable by the States. Therefore, the government function test does not aid Rockford.

The next argument raised by Rockford is that the *Montgomery Ward* court erred in limiting the exempt status to direct obligations issued by the United States in which it alone makes a binding promise to pay. Instead, Rockford contends that section 742 should be construed broadly, and relies upon *Smith v. Davis* (1944), 323 U.S. 111, 89 L. Ed. 107, 65 S. Ct. 157, for support. In *Smith*, the court held that the debt owed by the United States could be taxed by State officials because the debt did not constitute a credit instrumentality

within the meaning of the constitutional immunity from State taxation. Rockford recognizes the four incidents of credit instrumentalities previously discussed, but then cites the following language of the *Smith* court as the appropriate rule to apply to the instant facts:

"All of these related statutes are a clear indication of an intent to immunize from state taxation only the interest-bearing obligations of the United States which are needed to secure credit to carry on the necessary functions of government." (*Smith v. Davis* (1944), 323 U.S. 111, 119, 89 L. Ed. 107, 113, 65 S. Ct. 157, 161.)

Rockford argues that GNMA obligations serve the necessary government function of insuring adequate funding for home mortgages and that the tax exempt nature of the mortgage-backed securities is necessary to attract adequate capital. Rockford does not explain, however, why this test should be employed to the exclusion of the four criteria also enunciated by the *Smith* court. Furthermore, the above language requires that the certificate be an obligation of the United States. In contrast to the position advanced by Rockford, we conclude, as did the court in *Montgomery Ward*, that the obligations involved here are not direct obligations of the United States.

In further challenging the *Montgomery Ward* court's limitations of State tax exemption to direct and exclusive obligations of the Federal government, Rockford argues that to fall within the constitutional exemption, the obligation need not be directly issued by the United States government as long as the obligation is issued by an instrumentality of the government to carry out its governmental function or is guaranteed by the full faith and credit of the United States. Rockford places great emphasis on the Supreme Court's recent decision in *Memphis Bank & Trust Co. v. Garner* (1983), 459 U.S. 392, 74 L. Ed. 2d 562, 103 S. Ct. 692. There, a Tennessee statute authorized a tax on a bank's net earnings income from Federal obligations and defined net earnings to include interest earned from obligations of the United States and its instrumentalities, but excluded interest on similar obligations of Tennessee and its political subdivisions. The Supreme Court held that the State bank tax violated the immunity enjoyed by United States obligations from state and local taxation. The *Memphis Bank* court noted that the disputed tax was based upon interest earned "on various federal obligations, primarily notes and bills of the U.S. Treasury and obligations of Federal Credit Banks" (459 U.S. 392, 394-95, 74 L. Ed. 2d 562, 566, 103 S. Ct. 692, 695), and also noted in a footnote that FNMA obligations were held by the bank. (459 U.S. 392, 395 n. 4, 74 L. Ed. 2d 562, 566 n. 4, 103 S. Ct. 692, 695 n.4.) This

reference to FNMA obligations is the only one contained in the entire opinion. Therefore, we are more hesitant than is Rockford to interpret the *Memphis Bank* decision as holding that FNMA certificates are Federal obligations exempt from State taxation under section 742.

Even if *Memphis Bank* holds that FNMA obligations are exempt, however, that decision did not involve GNMA certificates. As the *Montgomery Ward* court recognized, GNMA certificates issued pursuant to section 1721(g) are significantly different than are FNMA certificates.

> "In this regard the Ginnie Maes issued in the instant case under 12 U.S.C. sec. 1721(g)(1976) differ from Mortgage Participation Certificates issued under 12 U.S.C. sec. 1717(c)(1976) and the Fannie Maes issued under 12 U.S.C. sec. 1719(d)(1976). Under the latter two sections FNMA and GNMA issue the certificates and are directly liable for payment. By contrast, the instant guarantee of payment is truly an indirect and contingent obligation of the United States and does not exempt the Ginnie Maes from State taxation." (*Montgomery Ward Life Insurance Co. v. Department of Local Government Affairs* (1980), 89 Ill. App. 3d 292, 299, 411 N.E.2d 973, 978.)

The presence of both a private issuer and the indirect liability of GNMA distinguishes GNMA section 1721(g) certificates from those issued directly by FNMA and thus, *Memphis Bank* is not determinative of the case at bar. *Montgomery Ward* therefore is the only case directly on point, and we find its reasoning persuasive.

■ Rockford also argues that the GNMA obligations are exempt from State taxation because GNMA is a Federal instrumentality and cites *Rust v. Johnson* (9th Cir. 1979), 597 F.2d 174, *cert. denied* (1979), 444 U.S. 964, 62 L. Ed. 2d 376, 100 S. Ct. 450, which held that a city's foreclosure on property without providing for FNMA's interest in the property was an unconstitutional exercise of State power over property of the Federal government in violation of the supremacy clause. Despite the *private ownership* of FNMA, the *Rust* court held that FNMA was a Federal instrumentality and its interest in the property was "property of the United States." *Rust,* however, does not require the conclusion that GNMA securities are United States property. Unlike FNMA securities, GNMA securities are issued and serviced by private issuers. Therefore, even if GNMA is considered a Federal instrumentality, the burden of the capital stock tax did not fall directly upon the instrumentality, but rather upon those who purchased the GNMA securities. This indirect burden on GNMA is insufficient to warrant State tax exemption.

"A state tax is not within the inhibition of state taxation of federal instrumentalities unless it is in fact a tax directly upon the government instrumentality, or its effect is so direct as to constitute it a substantial, as distinguished from an indirect and remote, interference with the exercise of the governmental functions delegated to the federal instrumentalities." (71 Am. Jur. 2d *State & Local Taxation* sec. 224 (1973).)

As the tax does not fall directly upon any Federal instrumentality, and as Rockford has not demonstrated how inclusion of the privately issued GNMA certificates in the capital stock tax calculation constitutes a substantial interference with the exercise of GNMA governmental functions, the certificates are not constitutionally or statutorily immune from State taxation.

Accordingly, we affirm the order of the circuit court of Winnebago County.

Affirmed.

SEIDENFELD, P.J., and HOPF, J., concur.